CHARLES M. BERNUTH AND SHIRLEY P. BERNUTH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ESTATE OF CARL VON BERNUTH, DECEASED, ELIZABETH VON BERNUTH, EXECUTRIX, ET AL., AND ELIZABETH VON BERNUTH, SURVIVING WIFE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4624-67, 4480-67. Filed November 15, 1971.

*Alvin D. Lurie*, for the petitioners.
*Patrick E. Whelan*, for the respondent.

QUEALY, *Judge:* The respondent has determined deficiencies in the income tax of the petitioners for the year 1959 as follows:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 4624-67 | Charles M. Bernuth and Shirley P. Bernuth | $10, 858. 24 |
| 4480-67 | Estate of Carl Von Bernuth, Deceased, Elizabeth Von Bernuth, Executrix, el al., and Elizabeth Von Bernuth, Surviving Wife. | 9, 088. 35 |

These cases were consolidated for trial and opinion because they present common issues of law and fact with respect to the deductibility of oil venture losses incurred by the respective petitioners.

In docket No. 4624-67, respondent concedes that the disallowance of intangible drilling expenses should be reduced from $12,964.17 to

$9,444.17. Numerous other adjustments to the petitioners' income have been disposed of as follows:

Docket No. 4624–67, Charles M. Bernuth and Shirley P. Bernuth.

1. Respondent is not asserting the negligence penalty.

2. Petitioners have not contested unallowed deductions for entertainment expenses and a charitable contribution.

3. Petitioners have not contested the assertion by respondent of additional income from omitted profit-sharing plan income and unreported long-term capital gain.

Docket No. 4480–67, Estate of Carl Von Bernuth, Deceased, Elizabeth Von Bernuth, Executrix, et al., and Elizabeth Von Bernuth, Surviving Wife.

1. Petitioners concede that the amount of $11,458.30 received from Bernuth Lembcke Co., Inc., was properly included in petitioners' income.

Consequently, the only issue remaining for decision is the amount of intangible drilling expenses which are deductible by the petitioners on certain oil ventures under section 263(c).[1]

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

For the calendar year 1959, the petitioners, Charles and Shirley Bernuth, and Elizabeth Von Bernuth and the estate of her deceased husband, Carl Von Bernuth, respectively, filed joint income tax returns as husband and wife on the cash basis of accounting with the district director of internal revenue, Manhattan District, at New York, N.Y. (References hereinafter to the petitioners shall mean those of the petitioners who have invested in the oil wells in issue, to wit, Charles Bernuth and Elizabeth Von Bernuth, and shall also include Carl Von Bernuth who died on July 19, 1959.)

At the time of the filing of their respective petitions, petitioner Elizabeth Von Bernuth was a legal resident of Dobbs Ferry, N.Y.; petitioner Charles Bernuth was a nonresident alien of the United States residing in Rome, Italy; and petitioner Shirley P. Bernuth was a legal resident of New York, N.Y.

Petitioners Carl Von Bernuth and Charles Bernuth were vice president and vice president/secretary, respectively, of Bernuth Lembcke Co., Inc., an importing and shipping corporation located in New York.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

The petitioners participated in 1959 in drilling oil and gas wells promoted by Barnwell Production Co. (hereinafter referred to as Barnwell), a partnership composed of R. S. Barnwell, Sr., and R. S. Barnwell, Jr. The principal office of Barnwell was located in Shreveport, La. The petitioners were free to accept or reject each of the proposed ventures.

During the calendar year 1959, the petitioners each entered into agreements (hereinafter sometimes referred to as participation agreements) with Barnwell covering their investments in each of the oil ventures in issue whereby each petitioner acquired from Barnwell fractional working interests in oil and gas leases and agreed to participate in the drilling of the wells in issue. These agreements provided that each petitioner would pay Barnwell a fixed sum for his (or her) participation in the drilling of a well at a designated location to a specified depth. Each petitioner further promised to pay his share of the cost of completing and readying for commercial production any well which proved to be successful. The agreements stated the price of a full (i.e., 100 percent) working interest, the full drilling cost, the percentage participation of each petitioner, the cost to each petitioner of his fractional working interest, and each petitioner's fractional share of the drilling cost.

The amounts set forth in the participation agreements for each well in controversy as (i) the cost of 100 percent of the working interest, (ii) the full turnkey drilling costs to a specified depth (exclusive of completion costs), and (iii) each petitioner's fractional share of such amounts are as follows:

| | Fred Bacot #1 | Eugene W #1 | Eugene W #2 | Eugene W #3 |
|---|---|---|---|---|
| 100-percent working interest | $15,000 | $15,000 | $15,000 | $15,000 |
| Full turnkey drilling cost [1] | 205,000 | 205,000 | 205,000 | 205,000 |

[1] This does not include completion costs.

| | Fred Bacot #1 | Eugene W #1 | Eugene W #2 | Eugene W #3 |
|---|---|---|---|---|
| *Charles Bernuth* | | | | |
| Percentage participation | 4 | 4 | 3.732 | 3 |
| Working interest | $600 | $600 | $559.80 | $450 |
| Drilling cost | $8,200 | $8,200 | $7,650.60 | $6,150 |
| *Carl Von Bernuth* | | | | |
| Percentage participation | 2 | 2 | 1.866 | ---------- |
| Working interest | $300 | $300 | $279.90 | ---------- |
| Drilling cost | $4,100 | $4,100 | $3,825.30 | ---------- |
| *Elizabeth Von Bernuth* | | | | |
| Percentage participation | 2 | 2 | 1.866 | 3 |
| Working interest | $300 | $300 | $279.90 | $450 |
| Drilling cost | $4,100 | $4,100 | $3,825.30 | $6,150 |

Petitioners acquired their interest in the first of the wells to be drilled by them in 1959, i.e., Fred Bacot #1, by reason of the participation agreements that had been executed by them on April 29, 1958, with Barnwell covering the drilling of Wallace #1 and #2. Wallace #1 having been a dry hole drilled in June 1958, Barnwell determined not to drill the proposed Wallace #2, and instead to drill Fred Bacot #1 at a different location, as a substitute for Wallace #2, but on all the same terms as had been provided in said original agreement.

Following completion of Fred Bacot #1 as a producing well, petitioners acquired their interests in each of the remaining wells in issue, i.e., Eugene W #1, #2, and #3, pursuant to an option to which they became entitled by virtue of their previous participation in the drilling of Wallace #1 and Fred Bacot #1. Under the terms of said option, the respective petitioners had the right to participate, to the extent of their interest in Wallace #1, in additional wells on adjoining acreage with the working interest cost and drilling cost of such additional wells to be computed on the same basis as Wallace #1, that is, $15,000 for the full working interest and $205,000 for the full drilling cost. The options as to each of the option wells in issue were exercised by the petitioners on successive dates in 1959 with each option being exercised following completion of the well commenced pursuant to a previously exercised option (except that Carl Von Bernuth, having died before the completion of Eugene W #2, did not exercise the option as to Eugene W #3, and his wife instead exercised his option as well as her own).

Under the agreements in the instant cases, Barnwell agreed for a fixed price to do all the work and furnish all the materials necessary to drill a hole to the agreed depth, assuming all risks of drilling, such as fire, blowout, lost bits, without additional expense to the petitioners. The cost of setting casing was treated as a completion cost and billed to petitioners separately from the fixed turnkey drilling cost.

The particular contracts offered the petitioners are known in the industry as "turnkey to the casing point" contracts. "Casing" refers to heavy steel pipe used to seal off fluids from the hole or to keep the hole from caving in. There may be several so-called strings of casing, one inside the other, in a single well. The "production string" serves as a conduit to the surface for produced oil. Most producing wells are completed by the setting of casing.

"Casing point" refers to the point in time when Barnwell, having drilled to the agreed depth, was to make a decision whether to set

casing in place. An affirmative decision reflected Barnwell's judgment that the well had a chance of being a producer.

In fixing the contract price to cover the drilling expenses, Barnwell first estimated its direct intangible drilling costs, then added an amount for its management overhead, a risk factor to cover the hazards insured against by the turnkey guarantee, a profit factor, and a commission factor to cover the promotional expenses involved in selling fractional interests in individual wells to New York investors. The petitioners expected to pay more for these agreements than the direct cost to Barnwell of having the wells drilled.

Each of the petitioners acquired his interests in the wells in issue subject to an operating agreement between Barnwell and Barnwell Drilling Co., Inc. (hereinafter referred to as Barnwell Drilling), covering the development and operation of these wells. Barnwell Drilling is a corporation, the stock of which is owned by R. S. Barnwell, Sr., and R. S. Barnwell, Jr. The principal office of Barnwell Drilling is in Shreveport, La.

Each participation agreement authorized Barnwell to enter into a drilling contract suitable to it with Barnwell Drilling. Although no such contracts were entered into, the actual work of drilling of the wells in issue was done by Barnwell Drilling.

Barnwell, which sold the petitioners their fractional interests in the wells in issue, retained for itself fractional working interests in each of the same wells, as follows:

| Well | Production Co. fractional working interest |
|---|---|
| Fred Bacot #1 | 0.3425 |
| Eugene W #1 | 0.2945 |
| Eugene W #2 | 0.3234 |
| Eugene W #3 | 0.23256 |

Barnwell paid the following amounts to Barnwell Drilling for its own share of the estimated direct cash expenditures of Barnwell Drilling for drilling and completing said wells:

| Well | Drilling costs | Intangible completion costs |
|---|---|---|
| Fred Bacot #1 | | $5,477.38 |
| Eugene W #1 | $24,149.00 | 4,077.92 |
| Eugene W #2 | 30,290.80 | 4,828.75 |
| Eugene W #3 | 16,949.40 | 2,758.78 |

Records of the amounts actually expended by Barnwell Drilling for the drilling of a particular well were not maintained.

Barnwell's acquisition costs for the leases underlying the wells in issue, and the respective selling prices to the petitioners and others for full working interests therein, were as follows:

| Well | Lease cost (for full working interest after 12.5-percent royalties) | Sales price (for full working interest after 28-percent royalties and overriding royalties) |
|---|---|---|
| Fred Bacot #1 | $2, 052. 64 | $15, 000 |
| Eugene W #1 | 4, 195. 00 | 15, 000 |
| Eugene W #2 | 4, 000. 00 | 15, 000 |
| Eugene W #3 | 4, 000. 00 | 15, 000 |

Barnwell acquired its right to the acreage in question under direct leases dated February 25, 1958 (for Fred Bacot #1), and March 17, 1958 (for the remaining wells), pursuant to which the lessee was obliged to drill on the leased acreage within 2 years or forfeit his interest, and to pay so-called delay rentals after 1 year if a well were not drilled. "Delay rentals" means a payment made to keep the lease in force if a well is not drilled by a certain date.

The amounts required to be paid by the respective petitioners under the participation agreements in respect of the wells at issue in the instant cases were paid by petitioners to Barnwell during 1958 in the case of Fred Bacot #1 [2] and during 1959, following the spudding of the respective wells, in case of the other three wells in suit. The spudding of the wells at issue herein occurred after execution by petitioners of the aforesaid participation agreements, and the drilling of all such wells was completed in 1959. The spud dates (the dates of commencing drilling) for the wells in issue are as follows:

Fred Bacot #1 _____Mar. 2, 1959
Eugene W #1 _____May 10, 1959
Eugene W #2 _____June 10, 1959
Eugene W #3 _____Oct. 19, 1959

With respect to his or her 1959 taxable year, timely election to claim intangible drilling and development costs as a current expense was made on behalf of each petitioner in accordance with the requirements of applicable regulations of the Secretary of the Treasury.

With respect to each well in issue, the holders of the working interests in the well constuted an unincorporated organization, and each such organization exercised a timely and effective election, as provided in section 761(a) of the Internal Revenue Code, to be excluded from the application of subchapter K of subtitle A of the said Code. Each of those elections was duly filed with the Internal Revenue Service

---

[2] The petitioners' payments in 1958 were actually made for the drilling of Wallace #2 for which Fred Bacot #1 was later substituted (as previously indicated in our Findings).

in the manner required by the regulations of the Secretary of the Treasury and was in force during the 1959 taxable years of petitioners.

For the taxable year 1959, the petitioners claimed in their tax returns deductions for oil venture losses, which included, *inter alia*, expenditures charged to them as intangible drilling and development costs in respect of oil ventures sponsored by Barnwell in Pike County, Miss. For the year in issue, each petitioner claimed a deduction for intangible drilling expenses in the exact amount of the drilling costs set out in the participation agreements (except as noted below in the case of Charles Bernuth) plus the intangible completion expenses. In his statutory notices of deficiency, respondent disallowed a portion of said oil venture losses attributable to intangible drilling costs and allowed additional depletion as follows:

| Name | Drilling costs disallowed | Additional depletion allowed |
| --- | --- | --- |
| Charles Bernuth | $12,964.17 | $593.49 |
| Carl and Elizabeth Von Bernuth | 12,963.57 | 371.78 |

Included in the foregoing disallowances is the sum of $3,520 on account of Charles Bernuth's deduction for one of the oil-drilling ventures, Fred Bacot #1. Charles Bernuth did not deduct drilling costs for that drilling venture in 1959 and thus respondent's asserted disallowances for that taxpayer has been reduced by $3,520 to the new figure of $9,444.17. Respondent has made no adjustments with respect to completion expenses.

The following schedule sets forth for the respective petitioners, by individual wells, intangible drilling and development costs claimed by the petitioners in their tax returns, the amount of intangible drilling and development costs that the respondent now proposes to disallow, and the percentage of the full working interest owned by each petitioner:

CHARLES AND SHIRLEY BERNUTH

| Well | Claimed | Determined | Disallowed | Percentage participation |
| --- | --- | --- | --- | --- |
| Fred Bacot #1 | $3,526.37 | $3,526.37 | | 4.00 |
| Eugene W #1 | 8,892.35 | 5,372.35 | $3,520.00 | 4.00 |
| Eugene W #2 | 10,517.80 | 7,233.64 | 3,284.16 | 3.732 |
| Eugene W #3 | 6,150.01 | 3,510.00 | 2,640.01 | 3.00 |

ELIZABETH VON BERNUTH AND THE ESTATE OF CARL VON BERNUTH

| Well | Claimed | Determined | Disallowed | Percentage participation |
| --- | --- | --- | --- | --- |
| Fred Bacot #1 | $11,726.37 | $8,206.37 | $3,520.00 | 4.00 |
| Eugene W #1 | 8,892.35 | 5,372.35 | 3,520.00 | 4.00 |
| Eugene W #2 | 9,084.20 | 5,800.84 | 3,284.16 | 3.732 |
| Eugene W #3 | 6,150.01 | 3,510.00 | 2,640.01 | 3.00 |

The fair market value of the working interest in each of the leases in question, if sold separately, was $15,000.

The respondent's determination of a deficiency in this case was predicated on the finding that the fair market value of the turnkey drilling contract for the drilling of the well on each of the leases in question, if contracted for separately, was $116,993.50.[3] The petitioner has presented no evidence to rebut that finding, and we therefore accept the respondent's finding as to fair market value.

### OPINION

At trial, petitioners moved for judgment on the pleadings on the basis that respondent was barred by the doctrine of collateral estoppel from relitigating a controversy in which the question posed is in essence identical to that decided by this Court in a Memorandum Opinion, *L. L. Stanton*, T.C. Memo. 1967–39. Initially, we refused to grant this motion. However, near the conclusion of the trial, petitioners again moved for judgment on the pleadings on the same basis. In this latter instance, we accepted a memorandum of law submitted by the petitioners in support of their motion and reserved decision on the motion, taking the motion under consideration.

Generally speaking, collateral estoppel applies to prevent repetitious suits between parties and their privies involving claims similar to issues already litigated when there has been no change in the applicable facts or controlling legal principles. *Commissioner* v. *Sunnen*, 333 U.S. 591 (1948); *McCall* v. *Commissioner*, 312 F. 2d 699 (C.A. 4, 1963); *John W. Amos*, 43 T.C. 50 (1964).

We recognize that the issue in the case before us, namely, the amount of intangible drilling expenses which are deductible by the petitioners on certain oil ventures under section 263(c), is identical to the issue decided by this Court in the case relied upon by petitioner as the basis for his assertion of collateral estoppel. We also recognize that the application of the doctrine of collateral estoppel is not prevented because the tax year herein in question is not the same as the tax year in question in the case set forth as the basis for estoppel. *Tait* v. *Western Md. Ry. Co.*, 289 U.S. 620 (1933); *Terre Haute Electric Co.* v. *Commissioner*, 96 F. 2d 383 (C.A. 7, 1938); and *Walter Wilson Flora*, 47 T.C. 410 (1967).

---

[3] In arriving at the fair market value of the turnkey drilling contract for the drilling of the well on each of the leases in question, the respondent relied upon recommendations made in an "Engineering and Valuation Report" prepared separately with respect to each of the docket numbers involved in this case. The petitioners offered these reports in evidence, and they were received by the Court for the purpose of showing the basis upon which the respondent predicated the deficiencies in this case.

In this case, however, the petitioners are not identical to or in privity with the petitioners involved in the prior cases, and the fact that the application of collateral estoppel is being sought against the respondent does not alter this lack of identity or privity of the petitioners in the respective cases.[4] In addition, we are dealing with a factual setting which differs from the prior case in that different wells are involved, and the resolution of this case involves a factual determination as to the amounts deductible as intangible drilling costs for those wells as well as a determination as to the legal principles which are properly applicable to the factual setting to determine the appropriateness of those amounts deducted.

On the basis of these considerations, we cannot find this to be a proper case for the application of the doctrine of collateral estoppel, and we again refuse to grant petitioners' motion for judgment on the pleadings.[5]

In this case, petitioners entered into separate participation agreements with Barnwell for the drilling of certain oil and gas wells in Pike County, Miss. Each such agreement covered both the assignment to the petitioners of a fractional working interest in a given lease and the participation by petitioners in a venture to drill a particular well on the specified lease on a "turnkey to the casing point" basis.

Each participation agreement set forth separately a stated price for the full working interest, the full drilling cost, the percentage participation of each petitioner, the cost to each petitioner for his fractional working interest, and each petitioner's fractional share of the drilling cost. The full turnkey drilling cost, exclusive of the completion costs, was specified in the participation agreements for each of the wells in question as $205,000, and the cost of the "working interest" was specified as $15,000. The petitioners paid to Barnwell the amounts specified in the contracts as their respective fractional shares of the fixed drilling costs and also their shares of the completion expenses, and they deducted these amounts on their respective 1959 Federal income tax returns as intangible drilling expenses [6] under section 263(c).

Under the participation agreements, the wells in question were drilled by Barnwell Drilling. R. S. Barnwell, Sr., and R. S. Barnwell, Jr., are the only shareholders of Barnwell Drilling and are the partners in Barnwell.

---

[4] Cf. *William Albert Belcher, Jr.,* T.C. Memo. 1965–1.

[5] For the same reasons, we do not regard *L. Lee Stanton,* T.C. Memo. 1967–39, as controlling precedent for our decision here. In other words, we do not consider that case to be an appropriate basis for the application of the principle of stare decisis to the case now before us.

[6] Petitioner Charles Bernuth did not claim any deduction for drilling expenses for the Fred Bacot #1 well in 1959.

Upon examination of the returns, respondent determined that not more than $116,993.50 was the reasonable cost for drilling each of the wells in question under a turnkey contract. The respondent disallowed the amount paid in excess of $116,993.50 and claimed by petitioners as a deduction for intangible drilling cost, contending that the disallowed portions were in fact capital expenditures to acquire interests in the oil wells in question.

In arriving at his determination as to the allowable amounts of intangible drilling expenses, the respondent relied upon recommendations made in an "Engineering and Valuation Report" prepared separately with respect to each of the two docket numbers involved in this case.[7]

The report for docket No. 4624–67 provides in pertinent part:

Comparison showed that the taxpayer had paid proportionate parts of amounts that, on the average, exceeded twice what an ordinarily prudent operator would have paid under footage contracts for having wells drilled to similar depths in comparable areas in corresponding periods of time. Because a flat-fee or turnkey arrangement tends to transfer liability for contingencies from the operator to the driller, the per-foot intangible drilling expense for a given well will normally be somewhat higher under a flat-fee contract than under a contract on a footage or daywork (time) basis. Not enough average or going flat-fee rates were available for comparison, so the going footage rates were increased by thirty percent to make them directly comparable to Barnwell's flat-fee costs. The thirty percent increment is considered * * * sufficient not only to make the footage costs and flat-fee costs directly comparable, but also to take cognizance of any extraordinary supervision or service performed by Barnwell for participants.

For each well, therefore, the average going cost multiplied by a factor of 1.3 is considered the maximum deductible as intangible drilling expense. * * *

This factor of 1.3 was also utilized in arriving at the recommendations made in the report relating to docket No. 4480–67.

The respondent utilized this factor to determine the fair market value of an independently negotiated turnkey drilling contract for the drilling of the well on each of the leases in question. The respondent's application of this factor has resulted in his allowing as a deduction for intangible drilling expenses only 57.07 percent ($116,993.50) of the amounts specified in the participation contract for each well (and thus each petitioner's respective share of those amounts) as the full turnkey drilling cost.

Originally, the option to deduct so-called intangible drilling and development costs as an expense or to capitalize them was not predi-

---

[7] Since the deficiencies in these cases were based on computations contained in these reports, we have accepted the reports as part of the explanation of the adjustments in the notice of deficiency on the basis upon which the respondent has predicated his action. *Clark* v. *Commissioner*, 266 F. 2d 698 (C.A. 9, 1959), affirming a Memorandum Opinion of this Court: *James H. Fitzner*, 31 T.C. 1252 (1959).

cated upon any specific statutory authority but developed solely by regulation.[8] Subsequently, Congress adopted a resolution stating that it "recognized and approved" the regulations granting the option. H. Con. Res. 50 (79th Cong., 1st Sess.). Then, in the 1954 Code, Congress specifically enacted authority to promulgate such regulations by providing in section 263(c) that:

regulations shall be prescribed by the Secretary or his delegate under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress.

Prior to 1943, amounts paid under turnkey drilling contracts were not within the option to capitalize intangible drilling expenses or to deduct them as a current expense. Rather, under prior case law, intangible drilling and development expenses incurred incident to a turnkey drilling contract were found to be capital in nature on the basis that when a taxpayer paid for a completed well, he was considered to have purchased a capital asset. See *Commissioner* v. *Ambrose*, 127 F. 2d 47 (C.A. 5, 1942); *J. K. Hughes Oil Co.* v. *Bass*, 62 F. 2d 176 (C.A. 5, 1932); *Old Farmers Oil Co.*, 12 B.T.A. 203 (1928).

The regulations in effect when these pre-1943 cases were decided made the option primarily applicable to expenses incurred by an operator drilling on his own lease or to amounts paid to a driller under a footage contract. See Regs. 103, sec. 19.23(m)–19(a)(1) (1939).

In 1943, this regulation was amended to specifically include costs incurred directly or through a contract for drilling, T.D. 5276, 1943 C.B. 151, and at present the regulations specifically provide for the applicability of the option to the cost of any drilling work done for operators by contractors under any form of contract, including turnkey contracts.[9] The only dispute between the parties centers on the determination as to what amount is properly deductible as the cost of the turnkey contract.

In their briefs, petitioners argue that since the total amount paid for the participation agreements was established through arm's-length negotiations and the parties agree that the amount paid for the work-

[8] Although prior to the 1954 Code there was no specific provision in the Internal Revenue Code for the expensing of intangible drilling costs, the option to expense or capitalize intangible drilling costs has existed since the first income tax statute. Judicial recognition of the existence of this option for the year 1916 can be found in *C. B. Shaffer,* 29 B.T.A. 1315 (1934). The regulations have granted taxpayers the option to expense or capitalize intangible drilling expenses since 1917, art. 170, Regs. 33, and these regulations were held valid by the courts. *United States* v. *Dakota-Montana Oil Co.*, 288 U.S. 459 (1933).

[9] Sec. 1.612–4(a), Income Tax Regs.

ing interest was reasonable, the excess over the amounts allowed by the respondent is properly allocated to the cost of drilling and therefore deductible. Hence, in effect, they conclude that the allocation established by the contract is controlling for purposes of our decision here. We disagree.

Both parties rested without presenting any evidence with respect to the going rate, i.e., fair market value, of an independently negotiated turnkey contract to drill the wells in question; and we have before us only the respondent's formulation of that cost. The petitioners did not introduce any evidence to refute that formulation. Consequently, for purposes of this case, we assume the correctness of the factual basis for the respondent's determination and accept his formulation of the reasonable cost for an independently negotiated turnkey drilling contract in this field.

Furthermore, no evidence was presented with respect to the manner in which the price for the drilling of each of the wells in question was fixed by the parties. Upon the basis of the entire record before us, and on the basis of the respondent's determination as to the cost of an independently negotiated turnkey drilling contract for a well in this field, the price set forth in the contract was excessive. That excess could have resulted from either (a) petitioners' inexperience in negotiating turnkey drilling contracts, (b) a premium to the promoter for arranging the working interest-turnkey drilling contract package, or (c) an intent to provide a sufficient amount to cover the drilling costs otherwise chargeable to the working interest of Barnwell.

Where a taxpayer enters into a contract for the drilling of a well, and through inexperience or otherwise, agrees to pay too much when compared to the "going rate" for the drilling of a well in a given field, the amount so agreed upon is not any less the cost to the taxpayer of drilling the well. Under such circumstances, this Court will not look behind the agreement of the parties and determine the amount allowable as a deduction for drilling cost in terms of the going rate, and the amounts specified in the contract are determinative.[10] *G. F. Hedges, Jr.*, 41 T.C. 695 (1964).

As to the particular wells in question in this case, the petitioners could not purchase the lease separately and then "shop" for a drilling contractor to drill the well. Instead, with respect to each well, the petitioners had to purchase the "package" embracing both the working interest and the drilling contract. The excess of the amount specified in the contract as to each of the wells in this case over the cost of independently acquiring a drilling contract for each of the wells

---

[10] Cf. *L. Lee Stanton*, T.C. Memo. 1967–39.

could have constituted a "premium" which the petitioners paid to the promoter for arranging the "package." If so, the allocation of the consideration as established by the contract would not necessarily be controlling. In such circumstances, this premium should be allocated to the various elements of the package in the proportion that the fair market value of each of these respective elements bears to the total cost of the "package." Cf. *C. D. Johnson Lumber Corporation*, 12 T.C. 348 (1949) ; *Nathan Blum*, 5 T.C. 702 (1945) ; and *Clifford Hemphill*, 25 B.T.A. 1351 (1932).

If the excess in question resulted from an intention on the part of the parties to provide a sufficient amount to cover the drilling costs otherwise chargeable to Barnwell, the regulations operate to prevent full deductibility of the amount specified in the contracts as the drilling cost. Section 1.612–4(a) provides in pertinent part :

Included in this option are all costs of drilling and development undertaken (directly or through a contract) by an operator of an oil and gas property * * * except that *in any case where any drilling or development project is undertaken for the grant or assignment of a fraction of the operating rights, only that part of the costs thereof which is attributable to such fractional interest is within this option.* In the excepted cases, costs of the project undertaken, including depreciable equipment furnished, *to the extent allocable to fractions of the operating rights held by others*, must be capitalized as the depletable capital cost of the fractional interest thus acquired. [Emphasis supplied.]

In other words, in the circumstances set out by the regulations above, the amount of the drilling cost which may be deducted by the owner of a fractional operating interest must be proportionate to that owner's fractional operating interest. See *Erwin H. Haass*, 55 T.C. 43 (1970). To hold that the values assigned to the component parts of the package by contract is, in such circumstances, nevertheless controlling upon the respondent, would mean that, with a modicum of simple arithmetic, the regulation would be nullified. In fact, the petitioners concede that in such circumstances, or where there may be a carried interest, the respondent is not bound by the allocation set forth in the contract.

Thus, the question of whether or not the price specified in a contract as the cost of drilling a well is controlling for purposes of determining the amount of such cost which is properly deductible is dependent upon the manner in which the price for the drilling of the particular well in question was fixed by the parties to the agreement. As stated above, no such evidence in this regard was presented to this Court; and, on the record before us, we have been constrained to find that the price specified in the contracts as the cost of drilling was excessive. Relying solely on the price specified in the contracts, the

petitioners presented no evidence to account for such excess. In the absence of such evidence, we must sustain the determination of the respondent.

Reviewed by the Court.

> *Decision will be entered under Rule 50 in Docket No. 4624-67.*
>
> *Decision will be entered for the respondent in Docket No. 4480-67.*

FORRESTER, *J.*, dissents.

---

TANNENWALD, *J.*, concurring: I concur in the result reached by the majority. It is obvious from the arithmetic that a portion of the excess payment involved herein was to cover the operator's share of the drilling cost. Such amount is clearly not deductible. In addition, the operators in this case were also the persons who put the deal together. It is conceded that they expected to make a profit but there is no evidence as to whether this profit was attributable to services in making the drilling arrangements or to the brokerage services. *G. F. Hedges, Jr.*, 41 T.C. 695 (1964), is distinguishable on several grounds. In the first place, taxpayer in that case made no payment to cover any portion of the operator's share of the drilling costs. In the second place, the amount of the payment allocable to the drilling costs was separately negotiated which is not the situation herein where only the total amount paid was the subject of negotiation. Finally, in *Hedges*, the only issue before the Court was whether the excess payment should be allocated to the working interest or to the drilling costs; no argument was presented that an allocation of a portion of the payment should be made to any other element, which is the issue before us in this case.

SIMPSON, IRWIN, and STERRETT *JJ.*, agree with this concurring opinion.

---

SCOTT, *J.*, dissenting: In an arm's-length transaction each petitioner agreed to the total cost of the working interest of each lease in which he purchased a fractional interest and the total cost for drilling on each lease. The parties agree that the amount stated in each agreement to represent the total cost of the working interest is the fair market value of such interest. The respondent determined that the amount stated as the drilling costs on each lease was in excess of the fair market value for drilling of the well. The majority opinion holds that petitioners have failed to overcome the presumption of correctness of respondent's determination. In my view the showing

made by each petitioner that the amount of the drilling cost for each well was arrived at by arm's-length negotiation with Barnwell is evidence sufficient to overcome the presumption of correctness attaching to this determination in respondent's notice of deficiency. I therefore disagree with the basis of the opinion of the majority.

The evidence shows that Barnwell did not pay an amount of the total agreed cost of drilling a well on each lease proportionate to its participation interest in that lease. It may be that the evidence is not sufficient to show that the amount of deduction for drilling costs disallowed by respondent to each petitioner is in excess of the amount paid by that petitioner for the "carried" interest of Barnwell and on this basis the result reached by the majority is correct. See *Erwin H. Haass*, 55 T.C. 43 (1970). However, it is not clear from the facts set forth by the majority whether respondent's disallowance could be fully sustained on this basis.

DRENNEN and HOYT, *JJ.*, agree with this dissent.

---

FAY, *J.*, dissenting: To the extent the majority herein relies on the determination that petitioners have failed to meet their burden of proof, I respectfully disagree. Receipt into evidence of the contract setting out the drilling costs is sufficient to meet petitioners' initial burden of proof. In the posture of this case, the burden of going forward then shifts to respondent, and absent some positive showing that the agreement is out of step with reality it should be respected and in my view warrants the conclusion that petitioners have met their burden.

DRENNEN, FORRESTER, and HOYT, *JJ.*, agree with this dissent.