H. PATRICIA ROBY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Roby v. Commissioner
Docket Nos. 10218-80, 4033-81, 4034-81, 4035-81, 4036-81, 4037-81, 4038-81, 4039-81, 4040-81.
United States Tax Court
T.C. Memo 1983-688; 1983 Tax Ct. Memo LEXIS 98; 47 T.C.M. (CCH) 340; T.C.M. (RIA) 83688; 81 Oil & Gas Rep. 427; November 21, 1983. Michael R. Becker and Sharon L. R. Miller, for the petitioners. Robert J. Kastl, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined the following deficiencies *99 in Federal income tax in these consolidated cases: Name
Docket No.
Year
Amount
H. Patricia Roby
10218-80
1976
$ 326.65
1977
354.33
Marvin Stockwell and
4033-81
1975
$11,854.00
Ester Stockwell
1976
8,198.65
1977
14,868.40
James M. Baker and
4034-81
1976
$ 296.00
Carol C. Baker
1977
1,833.77
Bauer Pride and
4035-81
1977
$ 162.30
Alice Pride
Robert E. Ballard, Jr.,
4036-81
1975
$ 441.14
and Marion G. Ballard
1976
83.75
1977
1,117.34
Ernest E. Jenks and
4037-81
1975
$ 1,219.00
Glenna W. Jenks
Ammon E. Yutzy and
4038-81
1976
$ 2,238.29
Mary E. Yutzy
1977
2,569.67
Eli B. Yoder and
4039-81
1975
$ 3,649.77
Emma Yoder
4039-81
1975
$ 3,649.77
Emma Yoder
1976
1,278.55
Freeda I. Jones
4040-81
1976
$ 547.49
1977
680.67
The issues for decision are (1) whether petitioners are entitled to the intangible drilling and development costs, depreciation deductions, and investment tax credit in the amounts claimed, (2) whether respondent bears the burden of proof in these cases, and (3) whether certain testimony at trial is inadmissible under Fed. R. Evid. 1002. [2]
*100 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by reference. All petitioners filed Federal income tax returns for the years in issue with the Internal Revenue Service Center, Cincinnati, Ohio. All petitioners resided in Ohio at the time of filing their petitions herein. Petitioners participated in drilling oil and gas wells promoted by Berwell Energy, Inc., of Columbus, Ohio (hereinafter referred to as "Berwell") as indicated below: Well
Percentage
Purchase
Share
Price
Roby: 1976 - Briar Hill Stone Co. 1-5
1
$ 5,000
1977 - Briar Hill Stone Co. 6-10
.9411
5,000
$ 10,000
Stockwell: 1975 - P. E. Spurgeon 1-3
3.33
$ 10,000
J. R. Weber 1-2
2.5
5,000
C. A. Devore 1-2
5
10,000
B. J. Durbin 1-3
3.33
10,000
R. Body 1-2
2.5
5,000
R. Baker 1-2
2.5
5,000
O. Lemmons 1-5
2
10,000
L. Mullet 1-3
3.33
10,000
1976 - Briar Hill Stone Co. 1-5
2
10,000
P. Jones 1-2
2.5
5,000
United Church of Christ 1-2
2.5
5,000
Campways 1-3
1.569
5,000
1977 - Briar Hill Stone Co. 6-10
1.8822
10,000
Briar Hill Stone Co. 11-13
1.569
5,000
Briar Hill Stone Co. 14-15
2.352
5,000
Campways 4-6
1.569
5,000
A. Winterhalter 1-3
1.569
5,000
$120,000
Baker: 1976 - Campways 1-3
1.569
$ 5,000
1977 - Briar Hill Stone Co. 6-10
.9411
5,000
A. Hoover 1-3
1.569
5,000
Briar Hill Stone Co. 11-13
1.569
5,000
Campways 4-6
1.569
5,000
$ 25,000
Pride: 1977 - Briar Hill Stone Co. 11-13
.7845
$ 2,500
Ballard: 1975 - O. Lemmons 1-5
1
$ 5,000
R. Body 1-2
2.5
5,000
1976 - Briar Hill Stone Co. 1-5
1
5,000
1977 - Briar Hill Stone Co. 6-10
.9411
5,000
$ 20,000
Jenks: 1975 - O. Lemmons 1-5
1
$ 5,000
B. J. Durbin 1-3
1.667
5,000
$ 10,000
Yutzy: 1976 - United Church of Christ 1-2
5
$ 10,000
Campways 1-3
1.569
5,000
1977 - Briar Hill Stone Co. 6-10
1.8822
10,000
Campways 4-6
1.569
5,000
Briar Hill Stone Co. 11-12
1.569
5,000
$ 35,000
Yoder: 1975 - J. R. Weber 1-2
2.5
$ 5,000
C. A. Devore 1-2
2.5
5,000
B. J. Durbin 1-3
1.667
5,000
R. Body 1-2
2.5
5,000
1976 - Campways 1-3
1.569
5,000
$ 25,000
Jones: 1976 - United Church of Christ 1-2
2.5
$ 5,000
Campways 1-3
.7845
2,500
1977 - Briar Hill Stone Co. 6-10
.47055
2,500
Campways 4-6
1.569
5,000
Briar Hill Stone Co. 14-15
1.176
2,500
$ 17,500
*101 Petitioners generally were not knowledgeable about the working aspects of the oil and gas business. Berwell was a corporation engaged in the trade or business of promoting oil and gas production and was experienced and skilled in selecting oil and gas property for development. Berwell acquired oil and gas leases, sold fractional working interests in the leases to others, developed and operated oil and gas wells, and sold the product produced by the wells. Berwell was wholly owned by Berwell Enterprises, Inc. and Berwell Enterprises, Inc. also wholly owned 20th Century Securities, Inc. (hereinafter referred to as "20th Century"). 20th Century acted as underwriter for all offerings for sale to investors of fractional working interests in oil and gas leases acquired by Berwell. All of the properties promoted by Berwell to petitioners herein were oil and gas leases to property located in Ohio. Each lease reserved a royalty to the landowner of 1/8th of the oil and gas located on the property. Of the remaining 7/8th of the oil and gas, an overriding royalty of 1/32nd was reserved by the lessee-sublessor in its assignment of the oil and gas leases to Berwell. Upon acquisition *102 of an oil and gas lease, Berwell would conduct a geological survey and a location survey and acquire a right of way to gain access to the property. Berwell would also obtain the necessary drilling permit and post a completion bond if required under local ordinance. Berwell would then arrange for the offering of fractional working interests in the lease to investors. The syndication of the working interests followed the same pattern in each instance. Berwell offered to sell fractional, nonproducing working interests in its oil and gas leases in small units representing about 1 to 2.5 percent of the lease for $5,000 each. An offering circular was prepared for each new syndication and was in a form prescribed by the State of Ohio. Each offering was underwritten by 20th Century for a commission of 15 percent of the gross proceeds of the offering, of which two-thirds was paid to the sales staff and one-third was retained by 20th Century. The gross commission payable to 20th Century was set out in the offering circular. Berwell offered to sell 80 percent of the working interests in the lease and retained 20 percent of the working interests for its own account. Berwell also retained *103 from slightly more than 8.5 percent to 10 percent of the gross proceeds of each offering for its own account. Each offering was registered for sale in Ohio with the State of Ohio, Department of Commerce, Division of Securities. Each registration denoted that the Department of Commerce for the State of Ohio found the proposed offer to be not on grossly unfair terms, under standards in effect in Ohio. For a proposed offer to be not on grossly unfair terms, the total of all compensation to be paid to the promoter and the underwriter in the aggregate could not exceed 40 percent of the reasonable value of the aggregate interests in the well. [3] Of the offerings under consideration, the total compensation paid to Berwell and 20th Century ranged from slightly under 37 percent to exactly 40 percent of the reasonable value of the aggregate interests in the well under Ohio standards, with most transactions equaling the 40 percent mark. The maximum underwriting commission allowed under Ohio registrations was 15 percent of the gross proceeds of the offering. *104 By executing a subscription agreement to purchase a fractional working interest in a well from Berwell, an investor was deemed to have entered into a participation agreement (hereinafter referred to as the "participation agreement") and an operating agreement (herinafter referred to as the "operating agreement") with Berwell. The documentation for each syndication was substantially identical. The participation agreement set out the understanding of the parties to drill a well, share in the costs of drilling, and share in the oil and gas produced by the well. A pertinent part of the participation agreements states: (1) Within 180 days, Berwell agrees to commence or cause to be commeced, operations for the drilling of * * * test wells * * * and, having commenced such operations, Berwell agrees to prosecute the same with due diligence until said wells have been drilled to a depth sufficient to test the Clinton Sand formation unless commercial oil or gas production is obtained at a lesser depth. Said wells shall be drilled at the sole risk and cost of Berwell, it being understood and agreed that payment of all sums set forth herein shall assure Investor of a paid working interest *105 in said test wells including costs of completion and equipment including pipe, casing, surface equipment, labor and all other expenses related thereto, with the Investor owning his prorata share of the materials and equipment ancillary to said wells. If, in Berwell's opinion, it is determined that a well will not produce oil or gas in paying quantities, then it will plug and abandon the hold without further cost to Investor and Investor shall have no interest in the salvage therefrom. (2) In consideration for the undertakings of Berwell, who shall act as operator and contractor with respect to said test wells, Investor shall pay to Berwell simultaneously with the execution of this Agreement, the sum shown on the Subscription Agreement as Investor's agreed-upon fully paid share of, drilling and completion costs, including equipment, for such well. * * * Thus, Berwell agreed to provide the wells in a condition ready to produce whatever oil and gas was present on a turnkey basis without right to charge the investors for drilling or completion expenses beyond the subscription price of the working interests offered for sale. Berwell bore the risk the wells could not be drilled and *106 completed at a cost at or below an amount equal to the aggregate subscription proceeds of a syndication. Berwell did not contractually bear a percentage of the costs and expenses of drilling and completing the wells with respect to the 20 percent of working interests retained in each well. Under the operating agreement, Berwell was designated as the operator of the interests with full and exclusive control of all development and operations concerning the wells. Each of the syndicates formed by an offering exercised a timely and effective election, as provided in section 761(a)(2), [4] to be excluded from the application of subchapter K of subtitle A of the Internal Revenue Code. Each of the petitioners and each of the syndicates in whicy they invested made a timely election under section 263(c) and section 1.612-4, Income Tax Regs., to currently deduct intangible drilling and development costs for Federal income tax purposes for the taxable years 1975, 1976, and 1977. Following the sale of the fractional *107 working interests to the investors, Berwell engaged the services of independent contractors to drill and complete the oil and gas wells to be provided by Berwell under its turnkey agreement. The drilling and completion services performed by the independent contractors included the drilling of the well and the work necessary to complete the well to the well head. Completion services included hook-up, casing, rods, tubing, pumping unit, motor, valves, nipples, gauges, fittings, separator, tanks, logging, and perforating. The drilling and completion services were performed under fixed price agreements of $60,000 to $65,000 per well. The fracturing of the wells was separately contracted. Of the 18 Berwell syndications before this Court, 12 involved a grant of the right to participate in any future wells to be drilled on the lease underlying the transaction in the same fractional interest as originally taken up (hereinafter called "rights of first refusal"). Two of the remaining six syndications did not offer such rights and the other four syndications regarded additional wells drilled on leases for which rights of first refusal were outstanding. [5]
*108 Berwell performed a variety of tasks and incurred various expenses in acquiring oil and gas leases, syndicating fractional interests, completing wells, selling oil and gas to be produced by the wells, servicing producing wells and managing the overall operation. Such expenses included (1) the salaries of Berwell employees, (2) legal, accounting, and printing expenses for each offering of fractional working interests, and (3) the commissions payable to 20th Century for the sale of working interests. The total cost to Berwell in locating an oil and gas lease, syndicating the project, completing and causing the completion of the wells therein and overseeing the production of oil and gas from the wells after completion generally exceeded the proceeds it received from the syndication of the oil and gas leases by an undetermined amount. Once a well started to produce oil and gas, Berwell operated the well and paid the expenses arising from operations. Berwell was compensated for its services as operator by a monthly charge to the holders of the working interests for each well being operated. Berwell expended more for operations than the compensation received from the holders of the *109 working interests, including its retained interests, for those services. Berwell advised petitioners and the other investors in its syndicates to treat their investments for Federal income tax purposes as being 75 percent for intangible drilling costs and 25 percent for tangible costs. Accordingly, petitioners deducted 75 percent of their investment as intangible drilling costs and claimed depreciation deductions and an investment tax credit with respect to the remaining 25 percent of the investment. Respondent determined the allocation of the amounts invested by petitioners in Berwell syndicates was unreasonable and allocated such amounts as follows: (1) 25 percent of the amount invested was determined to constitute nondepreciable capital expenditures; (2) of the remaining 75 percent, 20 percent of that amount (or 15 percent of the full amount invested) was determined to constitute the price paid for the working interest itself, and (3) the remaining 60 percent of the full amount invested was allocated two-thirds to intangible drilling costs and one-third to expenditures for depreciable well equipment. OPINION We must determine whether the amounts disallowed by respondent *110 for intangible drilling costs, depreciation deductions, and investment tax credit represent amounts expended, respectively, for intangible drilling costs or depreciable property in the drilling and completion of the wells concerned. We hold respondent's determinations are sustained. Intangible drilling and development costs (hereinafter referred to as "IDC") are the costs incurred by an operator of an oil and gas well for wages, fuel, repairs, hauling, supplies, and so forth incident to and necessary for the drilling of wells and the preparation of wells for the production of oil and gas. Sec. 1.612-4(a), Income Tax Regs.[6]
*111 The taxpayer is granted the option of capitalizing IDC to be returned as depletion or depreciation allowances to the extent available or to expenses these costs as they are incurred. Sec. 1.612-4(b)(1) and (2), Income Tax Regs. IDC include the cost to operators of drilling and development work done for them under a turnkey contract by a contractor. Sec. 1.612-4(a), Income Tax Regs.; Hedges v. Commissioner,41 T.C. 695 (1964). Petitioners are operators of oil and gas wells within the meaning of the income tax regulations and properly elected to expense their IDC. By the terms of the participation agreements in the instant cases, each investor was to pay an amount described as the investor's share of drilling and completion costs. However, the benefits secured to petitioners under the participation agreements were described as "a paid working interest in said * * * wells including costs of completion and equipment * * *." In investing in Berwell's syndicates, the petitioners purchased fractional working interests on a completed well basis for a standard price per unit offered.As such, the thing purchased by the investors was a package *112 of rights including the working interest and the turnkey promise of Berwell. Elements of the package included the drilling of the wells, the provision of depreciable property, and the skill and experience of Berwell and its expenses incurred in selecting and acquiring the leases for exploitation.
No specific allocation of the purchase price was made by the participation agreement to any of the activities giving rise to IDC, depreciable property to be provided, or other services to be performed by Berwell. However, Berwell advised the petitioners, and they so acted, to treat three-fourths of their investment as intangible drilling costs and the remaining one-fourth as the purchase price of depreciable property. Respondent determined this allocation was unreasonable and reallocated the purchase price. Where a taxpayer purchases a mixed aggregate of assets for one lumpsum purchase price, the price must be allocated to the several elements of the aggregate purchased. F & D Rentals, Inc. v. Commissioner,44 T.C. 335, 346 (1965), affd. 365 F.2d 34 (7th Cir. 1966); *113 C.D. Johnson Lumber Corporation v. Commissioner,12 T.C. 348 (1949). This principle applies in circumstances where the package of assets acquired embraces a working interest in an oil and gas lease and a turnkey drilling contract. Bernuth v. Commissioner,57 T.C. 225, 237 (1971), affd. 470 F.2d 710 (2d Cir. 1972). Respondent argues the instant cases are within the ambit of Bernuth v. Commissioner,supra, wherein we held a package of rights obtained by an investor in an oil and gas well was the proper subject for allocation of the purchase price among the elements of the package acquired. We agree. The present cases then come down to a factual question as to the allocations made by respondent. In this enquiry, the burden of showing respondent's determinations are incorrect rests with petitioners. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioners' argument rests on the propositions that Berwell made no profit from its syndication activities as such, and spent more on bringing the projects to production than it received from their syndication. *114 In this way petitioners contend they have shown the whole of the sums received by Berwell from the investors was actually spent towards IDC and depreciable property. This does not follow. In describing how Berwell spent the proceeds of the syndications, they demonstrated that a portion went towards expenditures not constituting either IDC or depreciable property costs, such as lease acquisition expenses and post completion production and servicing costs. As petitioners did not show how much was spent, either overall or by category, for any of the projects, it is impossible to draw the conclusion or even to infer that the entire proceeds of any of the syndications was so spent. Petitioners' evidence is inconsistent and incomplete. Petitioners also failed to show a rational basis for an allocation of the purchase price between IDC and depreciable property on a three-fourths to one-fourth basis as claimed in their returns. IDC does not include amounts properly allocable to the cost of depreciable property. Sec. 1.612-4(a), Income Tax Regs. The participation agreements *115 did not set out the separate price for drilling the wells or the supply of depreciable property, or otherwise make any allocation of the purchase price. Nothing else in the record provides a tenable explanation for the allocations made on the tax returns of the petitioners. Petitioners' suggestion that their allocation is supported by the fact that three-fourths of the proceeds of the offerings were earmarked to pay for the drilling and completion subcontracts increases the confusion. The subcontracts included the supply of depreciable property. Petitioners next argue the working interests had no value. Petitioners attempt to buttress this argument by explaining Berwell did not charge for the working interests because it wanted to be thought of as an oil and gas producer and not a promoter who made money from the syndication of leases. Assuming this is true for sake of argument, it does not stand for the proposition that the working interests were without value. Petitioners presented no evidence as to the value of the leases or any working interests therein as of the time they were syndicated. [7] Furthermore, petitioners presented no evidence as to the cost of the leases to *116 Berwell, although the record clearly indicates Berwell had costs in acquiring the leases. The present cases, therefore, are distinguishable from Hedges v. Commissioner,41 T.C. 695 (1964), wherein we found the promoter paid nothing for the leases and there was no reason for the promoter to charge the investors for an interest in the leases or the wells. [8] In Hedges, there ultimately was no question of allocations because all costs incurred were IDC. See Bernuth v. Commissioner,470 F.2d 710, 715-716 (2d Cir. 1972), affg. 57 T.C. 225 (1971). *117 Finally, petitioners' evidence also showed Berwell was experienced and skilled in locating oil and gas property and petitioners benefitted therefrom in investing with Berwell. This alone creates an inference that the leases had some value.[9]
It is fundamental that whatever petitioners contributed towards IDC can be expensed to the extent proportionate to their respective working interests. Sec. 1.612-4(a), Income Tax Regs.; Haass v. Commissioner,55 T.C. 43 (1970); Bernuth v. Commissioner,57 T.C. 225 (1971), *118 affd. 470 F.2d 710 (2d Cir. 1972). However, petitioners have not shown the amounts actually paid or expensed. Although petitioners' evidence showed Berwell spent more on each well or group of wells than it received from the syndication of the underlying lease, petitioner did not show the actual amount of such expenses either in the aggregate or broken down as IDC, equipment purchase costs, and other costs. As indicated earlier, petitioners' evidence indicates some of the expenditures were for items other than IDC or depreciable property. Therefore, it is not possible to determine what amounts were expended for IDC or depreciable property. Compounding petitioners' problems is the fact that the 20 percent working interest retained by Berwell did not contractually bear a percentage of the costs and expenses of drilling and completing the wells. To the extent petitioners paid Berwell's proportionate share of IDC, the amount of IDC claimed by petitioners must be reduced. Haass v. Commissioner,supra.However, as with the other elements of these cases, the record is silent as to the actual expenditures. Petitioners have failed to carry their burden *119 of proof in these cases. Bernuth v. Commissioner,supra. Petitioners' evidence falls far short of proving they were entitled to the full amounts claimed as deductions for IDC and on account of depreciable property. Consequently, respondent's determinations are sustained. Petitioners contend our decision in Stanton v. Commissioner,T.C. Memo. 1967-39, is controlling here.In Stanton, the Commissioner determined a portion of the IDC should be allocated to the working interest where the promoter of oil and gas wells agreed to provide the drilling on a fixed sum, turnkey basis. [10] We disagreed because the taxpayer's evidence convinced us that (1) the amount allocated by the parties for the working interest was reasonable in relation to its fair market value, (2) the amount allocated to drilling costs was reasonable, and (3) the investors, being experienced oil and gas investors, bargained at arm's length over the total price and its component elements.Petitioners in the present cases have not made this kind of showing.
*120 We turn to petitioners' argument that respondent should bear the burden of proof for the alleged failure to adequately explain why he made the reallocations of purchase price in his deficiency notices. We do not agree. The deficiency notice provides a formal notification that a deficiency in taxes has been determined. Standard Oil Co. v. Commissioner,43 B.T.A. 973 (1941), affd. 129 F.2d 363 (7th Cir. 1942). Our review of the record, including the deficiency notices, the pleadings, the stipulation, and opening statements of counsel at trial, clearly shows petitioners had adequate advance information of respondent's position. Jarvis v. Commissioner,78 T.C. 646, 655 (1982); Mayerson v. Commissioner,47 T.C. 340, 348 (1966). Petitioners' argument is without merit. Finally, we must consider respondent's objection at trial to certain of the testimony of John T. Klinkefus, chief executive officer of Berwell, on the ground the witness was attempting to prove the contents of records kept by Berwell. *121 Generally, the original writing is required to prove the contents thereof. Fed. R. Evid. 1002. However, where a witness testifies from personal knowledge, even though a writing contains the same information, the rule is not applicable. D'Angelo v. United States v. Atlantic Aviation Corp.,456 F.Supp. 127, 131 (D.Del. 1978), affd. without published opinion, 605 F.2d 1194 (3d Cir. 1979). The witness in the present cases testified from personal knowledge as to the expenses incurred by Berwell in the projects.The objection, therefore, was ill-founded. We have considered the other arguments of the parties in these cases and find them unpersuasive. Decisions will be entered for respondent in docket Nos. 10128-80, 4034-81, 4035-81, 4036-81, 4037-81, 4038-81, 4039-81, and 4040-81.
Decision will be entered under Rule 155 in docket No. 4033-81.
Footnotes
1. Cases of the following petitioners are consolidated herewith for trail, briefing, and opinion: Marvin Stockwell and Ester Stockwell, Docket No. 4033-81; James M. Baker and Carol C. Baker, Docket No. 4034-81; Bauer Pride and Alice Pride, Docket No. 4035-81; Robert E. Ballard, Jr., and Marion G. Ballard, Docket No. 4036-81; Ernest E. Jenks and Glenna W. Jenks, Docket No. 4037-81; Ammon E. Yutzy and Mary E. Yutzy, Docket No. 4038-81; Eli B. Yoder and Emma Yoder, Docket No. 4039-81; and Freeda I. Jones, Docket No. 4040-81.↩
2. Petitioners Marvin Stockwell and Ester Stockwell and respondent have made concessions as to the matters raised herein for taxable years 1976 and 1977.↩
3. The reasonable value of the aggregate interests in a well was limited, under Ohio standards, to 1.6667 times the estimated drilling and completion costs to be incurred in the project.↩
4. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the taxable years in issues.↩
5. A. Winterhalter 1-3 and A. Hoover 1-3 granted no right of first refusal. Campways 4-6 and Briar Hill Stone Co. 6-10, 11-13, and 14-15 were additional drillings.↩
6. Sec. 1.612-4, Income Tax Regs., was promulgated pursuant to section 263(c), the pertinent part of which states: [R]egulations shall be prescribed by the Secretary under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress. * * * For a summary of the history of the deduction for IDC, see Bernuth v. Commissioner,57 T.C. 225, 234-235 (1971), affd. 470 F.2d 710↩ (2d Cir. 1972).
7. Petitioners offered evidence that the working interests with producing oil wells were of value. However, this is not probative as to the value of the working interests at the time of syndication. ↩
8. In Hedges, we also found the taxpayer considered all amounts paid for the turnkey drilling and well preparation agreement with the promoter were his share of the costs of drilling and preparing a well for production. Hedges v. Commissioner,41 T.C. 695, 696↩ (1964). The record in the instant cases is mute on what the petitioners believed the amounts they paid were intended to cover.
9. "[The working interest] was not worthless, so long as there existed a prospect that oil gas might be discovered by drilling * * *." Platt v. Commissioner,207 F.2d 697, 700 (7th Cir. 1953), affg. 18 T.C. 1229↩ (1952). The prospect of discovering oil on the tracts in the instant cases was not nonexistent, or negligible. Berwell was experienced and skilled in choosing likely properties for development.
10. In Stanton, as in Hedges v. Commissioner,41 T.C. 695 (1964), and Bernuth v. Commissioner,57 T.C. 225 (1971), affd. 470 F.2d 710↩ (2d Cir. 1972), the issue concerned only allocations between IDC and the working interest.