THOMAS C. REGAN and DONNA L. REGAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Regan v. Commissioner
Docket No. 1350-79.
United States Tax Court
T.C. Memo 1982-733; 1982 Tax Ct. Memo LEXIS 13; 45 T.C.M. (CCH) 389; T.C.M. (RIA) 82733; December 23, 1982. William C. Hultman, for the petitioners. George W. Connelly, Jr., for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Year
Deficiency
1971
$5,284.34
1972
2,406.32
1974
1,053.21
1975
722.00
The issues for decision are: 1. Whether petitioner Thomas C. Regan's cost basis in a herd of polled Hereford cattle exceeds $6,180, for purposes of computing depreciation and the investment tax credit allowable under *15 sections 167 [1] and 38, respectively; and 2. Whether petitioner Thomas C. Regan effectively elected the use of the half-year convention pursuant to section 167(m) and the regulations thereunder. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Thomas C. Regan (hereinafter petitioner) and Donna L. Regan, husband and wife, resided in Lockport, New York, at the time that they filed their petition in this case. They filed their 1971, 1972, 1974, and 1975 joint Federal income tax returns with the North-Atlantic Service Center, Andover, Massachusetts. Petitioner is a physician whose specialty is surgery. During late 1970, petitioner incorporated his medical practice with the assistance of Frank Critelli (hereinafter Critelli) and an individual known as Monesi, [2] both of whom were affiliated with a Buffalo, New York, organization known as ILICOB. About the same time that Critelli and Monesi were assisting petitioner in incorporating his medical practice, they approached him with a proposition for investing in purebred *16 polled Hereford cattle. When Critelli and Monesi approached petitioner about making an investment in cattle, he was an experienced investor; he had invested in securities since 1961. Prior to Critelli's and Monesi's proposition, however, petitioner had never lived on a farm, raised animals, invested in cattle, heard of polled Herefords, or expressed any interest in such an investment. Critelli and Monesi furnished petitioner with a prospectus from Calderone-Curran Ranches, Inc. (hereinafter CCF) dated September 14, 1971, offering for sale "managed breeding herds," with each herd consisting of 10 purebred polled Hereford female animals. On August 28, 1968, CCR was incorporated under the laws of Michigan, with its principal place of business in Grass Lake, Michigan. CCR was engaged principally in the business of raising and maintaining purebred polled Hereford cattle for breeding purposes, both for its own account and for the account of others. A total of 300 "managed breeding herds" were offered for sale under CCR's prospectus at $35,000 per herd ($3,500 per animal). Each herd of 10 cows was to contain animals ranging *17 from 1 through 4 years in age. All of the animals were to be selected at the discretion of CCR and CCR did not "assure that the age mix of a particular herd will be comparable to the age mix of each other herd." Prospective investors were offered two avenues for purchasing such a herd. Under the first alternative, an investor could pay the entire purchase price in cash; which would entitle him to purchase a herd at a 7 percent discount, or $32,550 ($3,255 per animal). An investor who purchased a herd for cash was given the option of entering a 7-year maintenance contract with CCR, but was not required to do so. The other alternative was for an investor to make a $5,000 down payment and execute a negotiable promissory note for the balance ($30,000), which bore interest at 7 percent. An investor who elected this route, however, was required to enter into a nonassignable (by the herd owner) 7-year maintenance contract with CCR. CCR's prospectus stated that the offering was designed "to permit persons with high ordinary taxable income to become breeders of registered purebred Polled Hereford cattle and to build herds through the use of the Company's management and facilities." In *18 addition, the prospectus discussed at length the Federal income tax consequences that could result from the purchase of a herd and the subsequent sale of the herd or individual animals from it. Specifically, CCR's prospectus described in considerable detail the depreciation deductions from the purchase of a herd; it also described the extent to which an owner of cattle could obtain favorable capital gains treatment when the cattle were sold. [3] The prospectus set forth a pro forma investment analysis with respect to hypothetical herds purchased under a deferred payment plan. The pro forma investment analysis estimated that an initial herd of 10 animals would grow to 67 animals over a 7-year period, and it showed the annual tax savings that would be generated as a result of deductions for depreciation and interest payments in the case of herds purchased by investors who were subject to marginal tax rates of 50 percent, 60 percent, or 70 percent. [4] The analysis also showed the annual and cumulative "Investment Cost After Tax Deductions" that would be incurred in the year of purchase and during the following 7 years. [5]
*19 On December 22, 1971, petitioner purchased from CCR a herd of 10 purebred polled Hereford cows for $35,000. Petitioner's purchase was made pursuant to CCR's deferred payment plan whereby petitioner gave CCR a $5,000 downpayment and a negotiable promissory note for the $30,000 balance. The note was payable over 7 years in monthly or semiannual installments with interest at the rate of 7 percent. Petitioner was personally liable for the repayment of the note. In connection with the purchase, petitioner also executed a lien letter on December 22, 1971, which gave CCR a security interest in both his herd and any offspring thereof until petitioner made full payment of the note. Petitioner entered into a 7-year maintenance contract with CCR on the same day that he purchased the herd. [6] Under the terms of the contract, CCR agreed to "care for, supervise, feed and do whatever else is necessary and proper for the well being" of petitioner's herd and to provide the necessary bull battery to breed petitioner's animals. Under the maintenance contract, CCR further agreed to substitute another purebred polled Hereford cow for any animal in petitioner's heard over 1 year of age and under *20 11 years of age that died or, in the opinion of CCR, should be culled from the herd or destroyed. The contract further provided that CCR would receive as a maintenance fee all of the bull calves produced by petitioner's herd for the 7-year contract term. [7] In the portion of the prospectus entitled "Notes to Financial Statements," CCR made the following statement about such calves: As compensation for maintenance of the investors' herds, the Company [CCR] receives from the progeny all bull calves and one out of every ten heifer calves. Heifer calves, intended to be used as replacements or as feeder cattle, have been valued at $150 each. Of the bull calves, seventy per cent are being raised for resale as commercial and purebred breeding bulls valued *21 at $600 each, with the remainder at $200 each to be used as feeder cattle. CCR's prospectus warns the investor that, in the event it failed to perform the maintenance contract, investors will be forced either to sell their herds or to find another organization to manage their herds, and in the latter case "the maintenance fee may be substantially higher than that offered" by CCR. Petitioner viewed CCR's offering as an investment opportunity with the possibility for growth. He was also motivated to invest therein due to the expected tax benefits described in the prospectus. When petitioner purchased his herd from CCR, he understood the details of CCR's projection of tax benefits and that such benefits were premised upon a herd of 10 animals having a cost basis of $35,000. In its prospectus, CCR stated that it had acquired only a small portion of the animals offered for sale and that it expected to acquire most of the remaining cattle to be sold under the offering at prices "between $400 and $1,200 per animal and at an average price of $600 per animal." The prospectus further states as follows: The difference between the net price [8] of approximately $3,200 per animal to be *22 received by the Company [CCR] for cattle in herds offered hereby and the price to the Company for cattle purchased or to be purchased by it reflects the following costs and factors: cost of breeding and maintaining the animals prior to sale, cost of investigation and inspection of cattle in order to obtain quality animals, transportation and insurance for purchased animals, veterinarian fees, costs of replacing culled and destroyed animals under the Maintenance Contract, cost of maintaining the Company's battery of purebred bulls for breeding purposes, costs of this offering, financing costs, overhead charges for supervisory and management staffs and a profit to the Company. The proceeds to be received from the sale of herds offered hereby will be used for general corporate purposes, including the purchase of cattle to be sold hereunder and normal maintenance expenses, such as labor, feed, property rental, veterinary and general administrative costs, incurred for herds managed by the Company for investors under *23 this offering and for existing investors and for the Company's own breeding herd. Due to the markup involved with respect to the herds sold by CCR, the prospectus warns the investor that he should anticipate a loss if he resells his cattle relatively early after their acquisition in a market comparable to that in which CCR purchased such animals. CCR's prospectus contains a "Statement of Operations and Retained Earnings" covering various periods between August 28, 1968 and June 30, 1971. Note (c) to that Statement reveals the following information: (c) During 1970, the Company [CCR] rescinded a sales contract and repurchased the investor's herd including the progeny for $70,758 cash, the aggregate of the investor's principal and interest payments on his original Company financial notes of $150,000 dated January 11, 1969. In addition, the Company relinquished its right to the note balance of $85,959. The purebreds received were valued at $38,241 and the resulting total loss was $118,476. Before petitioner purchased his herd from CCR, he did not receive any information from Critelli or Monesi other than the promotional materials furnished by CCR, indicating the price at which *24 polled Hereford cattle could be purchased in the open market. Petitioner did not independently attempt to ascertain the prices at which such cattle could be purchased or attempt to learn what CCR's costs were to breed, investigate, inspect and maintain its animals. Prior to purchasing one of CCR's herds, the costs of the following provisions during the term of the maintenance contract were to be borne by CCR rather than separately paid for by him: Grazing land, shelter, food, veterinary service, registration, replacement of dead or culled cattle between 1 and 11 years of age, and stud fees with bulls having desirable breeding characteristics. Nevertheless, petitioner never inquired how much each of these items would cost CCR, nor did he receive any projection of CCR's anticipated costs. During August 1974, CCR endorsed petitioner's December 1971 promissory note to the Bank of the Commonwealth (hereinafter the bank), a Michigan banking corporation located in Detroit, Michigan, and concurrently assigned and transferred its security interest in petitioner's cattle to the bank. This action was taken pursuant to a preexisting financing agreement between CCR and the bank. On or *25 about August 8, 1975, CCR filed a petition for Arrangement pursuant to Chapter XI of the Bankruptcy Act in the United States District Court for the Eastern District of Michigan (hereinafter the district court). Concurrent with the filing of that petition, a receiver was appointed by the district court to operate and manage CCR's assets. Throughout 1975, petitioner was unaware of CCR's financial difficulties, and he continued to make his monthly payments of $275 ($3,300 per year) to CCR from 1972 through 1975. [9]
During August 1976, CCR was adjudicated bankrupt by the district court. Thereafter CCR defaulted on the performance of its maintenance contract with petitioner. During September 1976, the bank wrote to petitioner and other persons who had purchased herds from CCR and advised them of CCR's bankruptcy. The letter further advised them that a corporation known as Mac-Barb, Inc., had been designated to hold and maintain their herds at a charge of $40 per month, but the letter did not specify the extent of *26 the maintenance which would be provided. At that time, the bank also advised petitioner of his rights and obligations to the bank under his December 1971 promissory note, and offered him four alternative approaches for satisfying his liability thereunder and disposing of his herd. [10] The receipt of the bank's September 1976 letter was the first notice that petitioner received with respect to CCR's having been involved in a bankruptcy proceeding. Petitioner entered into negotiations with the bank which culminated *27 in a full and final settlement of his obligations under the December 1971 promissory note whereby he made a final payment of $11,689.79 on November 11, 1976. Petitioner and the bank further agreed that petitioner's herd (including the progeny of his original cattle) would be delivered to him at CCR's premises in Michigan. At such time the balance due on such note was $23,399.59 and, thus, petitioner was relieved of paying $11,445.80 of the original contract price by virtue of his settlement with the bank. Taking into account petitioner's payments to CCR as well as his final settlement with the bank, petitioner's principal payments on his promissory note totalled $23,554.20. The $11,689.79 payment which petitioner made to the bank, in final settlement of his promissory note, included $264 for incidental costs that were not intended to be in settlement of the amount then outstanding on the note. In addition to cancelling the balance due on petitioner's promissory note, petitioner's December 1971 maintenance contract was formally cancelled as a result of petitioner's settlement with the bank. During December 1976, petitioner traveled to Michigan in order to take possession of *28 the herd that he had purchased from CCR. After arriving, he learned that his herd was actually located and being maintained in the State of Alabama. Rather than make arrangements to take possession of his herd in Alabama, petitioner and the bankruptcy trustee of CCR's estate agreed that petitioner would, in lieu of his actual herd, take possession of an equivalent herd of cattle, consisting of 33 polled female Herefords from among the cattle previously maintained by CCR in Michigan. On December 9, 1976, petitioner took possession of the "equivalent herd," and he purchased a breeding bull from CCR's bankruptcy trustee for $600 on December 10, 1976. Petitioner thereafter shipped all of these cattle to western New York at a cost of $552. Between December 1971 and December 9, 1976, petitioner did not purchase any more cattle from CCR or from third parties. During that same period, petitioner did not sell any of the cattle which he had purchased from CCR or any of their offspring. Since December 1976, petitioner has boarded his cattle with a friend who owns a farm in western New York. As of May 13, 1980, petitioner's herd consisted of 31 animals. During 1977 and in conjunction *29 with respondent's examination of petitioner's returns for the years in issue, as well as the returns of other taxpayers who purchased cattle from CCR, an Internal Revenue Service agent conducted an examination of CCR's books and records for the years 1971 through 1974. Those records revealed that, during 1971, CCR had purchased 152 polled Hereford cattle at prices ranging from $275 to $500, with an average cost of $366 per animal. The records further revealed that, during 1972, CCR purchased 159 such cattle at prices ranging from $243 to $550, with an average cost of $391 per animal. CCR's records also reflected that its transportation fees in connection with the foregoing purchases averaged $36 per animal, and its brokerage fees averaged approximately 10 percent of the cost of each animal. Income Tax Returns and Notice of Deficiency
On Schedule F (Form 1040) of petitioner's 1971 Federal income tax return, petitioner claimed a net farm loss of $8,429, with respect to the herd that he purchased from CCR. Such loss was comprised of $4,000 claimed as "additional first-year depreciation," [11] as well as "other" depreciation of $4,429. The "other" depreciation was computed using *30 a cost basis of $31,000 ($35,000 - $4,000 additional first-year depreciation), a claimed 7-year useful life under the 200 percent double-declining balance method and the half-year convention of respondent's Asset Depreciation Range (ADR) system. [12] The depreciation section of Schedule F of petitioner's 1971 return did not specify that the "other" depreciation of $4,429 was computed under the half-year convention, or that petitioner intended to elect that convention under the ADR system. Petitioner did not attach a Form 4832 or a substitute for Form 4832 to that return in order to make the election, and the $4,429 of "other" claimed depreciation was not listed on his Schedule F as being "Depreciation from Form 4832." [13] When petitioner filed his 1971 return, he did not realize that completing and attaching Form 4832 to his return was considered by respondent as the method for electing ADR and the half-year convention. *31 On Schedule F of his returns for 1972 through 1975, petitioner claimed the following depreciation, interest and net farm losses with respect to his herd: Year
Depreciation
Interest
Net Farm Loss
1972
$7,599.30
$2,061.00
$9,660.30
[14] 1973 5,429.21
1,971.17
7,391.38
1974
3,871.85
1,875.09
5,746.94
1975
2,768.38
1,756.53
4,524.91
In the notice of deficiency, respondent determined that for depreciation and investment credit purposes, only $6,180 of the $35,000 cost to participate in CCR's "Breeding Program" was attributable to the breeding herd of 10 cows. Respondent arrived at the figure of $618 per animal on the basis of the information derived from the revenue agent who had examined CCR's books and records during 1977. The $618 amount consisted of the following elements: Average Cost of cows purchased by CCR during 1971
$388
Transportation charges
36
Brokerage fee (10 percent of cost)
39
Estimated profit to CCR (40 percent of cost)
155
$618
*32 Respondent further determined that petitioner was not allowed the use of the half-year convention for 1971, and only allowed petitioner one month of depreciation in 1971 for the cattle which he purchased on December 22 of that year. [15]
*33 OPINION Issue 1: Basis in Petitioner's Cattle
We must determine whether petitioner's cost basis in his herd of polled Hereford cattle purchased from CCR exceeds $6,180 for purposes of computing his investment tax credit and depreciation deductions. Petitioner argues that he originally agreed to pay $35,000 for the herd in an arm's-length transaction, and therefore, he is entitled to a basis of $35,000 for depreciation and investment tax credit purposes. [16] According to petitioner, CCR's herd purchase and maintenance agreements were formally separate agreements, each having its own stated consideration. Consequently, petitioner contends that to disallow the use of the $35,000 purchase price as the cost basis of his herd would be tantamount to "neglecting the legal rights and duties created between the parties to the sale agreement * * *." Respondent, on the other hand, maintains that petitioner's basis in the cattle should be limited to their fair market value, and that petitioner has not established that the fair market value of his herd was in excess of $6,180 on December 22, 1971, the date of purchase. [17] For the reasons set forth below, we hold for respondent. *34 We start with the basic proposition that a taxpayer's basis for purposes of computing the amount of his investment tax credit and depreciation deductions is his cost. See secs. 38, 46(c)(1)(A), 167(g), 179(a), 1011(a), and 1012. As a general rule the price at which a taxpayer agrees to purchase assets, plus any additional expenses of acquiring them, will be treated as their cost. Majestic Securities Corp. v. Commissioner,42 B.T.A. 698 (1940), affd. 120 F. 2d 12 (8th Cir. 1941); *35 Bixby v. Commissioner,58 T.C. 757 (1972). Thus, in a money-for-property transaction, cost is equal to the price paid for the property. Edwards v. Commissioner,19 T.C. 275, 279 (1952). In Bixby v. Commissioner,supra at 776, however, we held that this rule is inapplicable where a transaction is not conducted at arm's-length by two economically self-interested parties, or where a transaction involves "peculiar circumstances" which influence the purchaser to agree to a price in excess of the property's fair market value. See also Lemmen v. Commissioner,77 T.C. 1326, 1347-1348 (1981). In such situations, the basis of property may, for tax purposes, be limited to its fair market value. See Lemmen v. Commissioner,supra;Mountain Wholesale Co. v. Commissioner,17 T.C. 870, 875 (1951); G.U.R. Co. v. Commissioner,41 B.T.A. 223 (1940), affd. 117 F. 2d 187 (7th Cir. 1941). In support of his argument that CCR's purchase and maintenance agreements were formally separate agreements, with separately stated consideration, petitioner states that the maintenance *36 contract was cancellable upon 30 days' written notice. Thus, petitioner contends that an allocation of a portion of the $35,000 purchase price to the maintenance contract would result in neglecting the legal rights and duties created between the parties. We disagree. While the herd purchase and maintenance agreements give the appearance that they were separately bargained for, petitioner's option to cancel his maintenance contract and exercise control over his herd was more apparent than real. We think that CCR's offering is best viewed as a package containing two elements, cattle and a maintenance contract. CCR was not simply selling cattle, but was offering "managed breeding herds" to investors. The prospectus states that "[t]he herds offered hereby are designed to permit persons with high ordinary taxable income to become breeders of registered purebred Polled Hereford cattle and to build herds through the use of the Company's management and facilities." Upon reading CCR's prospectus, petitioner could have had no doubt that the stated "purchase" price of the herds considerably exceeded the fair market value of the cattle and that the consideration set forth in the maintenance *37 contract was less than the cost of comparable maintenance from other sources. The prospectus states that a purchaser should anticipate a loss if he resells his cattle relatively early after their acquisition and warned that if a purchaser retained an organization other than CCR to manage his herd "the maintenance fee may be substantially higher than that offered" by CCR. Petitioner was an experienced investor at the time he examined CCR's prospectus. He had been buying securities since 1961. He testified that he read CCR's prospectus thoroughly, that one of the things he was looking for in CCR's investment package was a certain level of tax benefits, and that the tax benefits projected in the prospectus depended upon the herd having a cost basis of $35,000.While an investor who thoroughly read CCR's prospectus must have realized that the $35,000 per herd purchase price was highly inflated when compared to the herd's fair market value, it is easy to imagine why he would be amenable to allocating the entire amount to the cost of the herd rather than its maintenance. To the extent that the purchase price is inflated, the investor, absent an audit by respondent, can recoup that amount *38 through larger depreciation deductions. Furthermore, CCR would have no objection to conferring larger tax benefits on its investors when, as here, it can do so at little or no cost to itself. While we think that both petitioner and CCR were "economically self-interested" and that their dealings were conducted at arm's-length, petitioner has not established that the $35,000 purchase price was totally allocable to the 10 cattle independent of the maintenance contract. Given the "peculiar circumstances" of the instant case, Bixby v. Commissioner,supra, we find that petitioner's cost basis in his cattle must be limited to their fair market value. Lemmen v. Commissioner,supra at 1348, 1349. See also Mountain Wholesale Co. v. Commissioner,supra at 875. Compare Bernuth v. Commissioner,57 T.C. 225 (1971), affd. 470 F. 2d 710 (2d Cir. 1972). We must now consider the amount of the $35,000 purchase price which was attributable to the fair market value of petitioner's herd. See Lemmen v. Commissioner,supra;Bixby v. Commissioner,supra. Respondent *39 determined, based on factors set forth in our findings, that the fair market value of petitioner's herd was $6,180 ($618 per animal).Respondent's determination is presumptively correct and petitioner has the burden of proving a different cost in order to prevail in this proceeding. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
In the prospectus, CCR states that it expected to acquire all of the polled Hereford cattle for the offering at an average cost of $600 per animal. Respondent's determination is based on a cost of $618 per animal. On brief, petitioner criticized respondent's figure of $618 per animal, alleging that respondent looked at wholesale rather than retail markets, and that respondent failed to, inter alia, consider that CCR incurred certain costs and expenses (i.e., inspection of cattle to obtain quality animals and insurance for purchased animals) which ought to be included in computing a cost per animal. Petitioner, however, has offered no evidence to substantiate a cost per animal in excess of that determined by respondent. Consequently, we hold that petitioner's basis in his herd, for purposes *40 of computing the investment tax credit and depreciation deductions, is $6,180.
Issue 2: ADR Election and the Half-Year Convention
The last issue before us, is whether petitioner effectively elected the half-year convention pursuant to section 167(m) and the regulations thereunder. If so, petitioner is entitled to claim 6 months' depreciation for 1971 on the herd which he purchased from CCR on December 22 of such year. In his petition, petitioner claims that he intended to elect the Asset Depreciation Range (ADR) system and the half-year convention when he filed his 1971 Federal income tax return. On brief, petitioner argues that the information which he provided in his 1971 return substantially complied with the requirements of section 1.167(a)-11(f), Income Tax Regs., and, therefore, he effectively elected the half-year convention.Respondent disagrees and maintains that only a "mystic" could examine petitioner's 1971 return and surmise that petitioner had elected the half-year convention. Since the resolution of this issue depends upon an understanding of the statutory and regulatory scheme establishing the ADR system, we shall begin our analysis by first examining that *41 scheme. Section 167(m) is the statutory authority for the ADR method of computing depreciation, under which respondent has implemented the half-year convention that petitioner seeks to use. Section 167(m) provides in pertinent part as follows: (1) In General. In the case of a taxpayer who has made an election under this subsection for the taxable year, the term "reasonable allowance" as used in subsection (a) means * * * only an allowance based on the class life prescribed by the Secretary or his delegate * * *. (3) Making of Election.An election under this subsection for any taxable year shall be made at such time, in such manner, and subject to such conditions as may be prescribed by the Secretary or his delegate by regulations. On June 22, 1971, respondent promulgated section 1.167(a)-11, Income Tax Regs., which implemented the ADR system. The half-year convention is authorized under paragraph (c)(2) of that regulation, which provides in pertinent part as follows: (i) In general. * * * An election to apply this section must specify the convention adopted. (See paragraph (f) of this section for information required in making the election.) (iii) Half-year convention. *42 The depreciation allowance for a vintage account for which the taxpayer adopts the "half-year convention" shall be determined by treating all property in the account as placed in service on the first day of the second half of the taxable year * * *. The form of the ADR election is prescribed by section 1.167(a)-11(f), Income Tax Regs. This regulation details the time and manner of the election as well as the information which must be included in the election, as follows: [18]
(1) Time and manner of election. (i) In general. An election to apply this section to eligible property shall be made with the income tax return filed for the taxable year in which the property is first placed in service * * * by the taxpayer * * *. If an election is not *43 made within the time and in the manner prescribed in this paragraph, no election may be made for such taxable year (by the filing of an amended return or in any other manner) with respect to any eligible property placed in service in the taxable year. [Emphasis added.] (2) Information required. The election under this section must specify: (i) That the taxpayer makes such election and consents to, and agrees to apply, all the provisions of this section; (ii) The asset guideline class for each vintage account of the taxable year; (iii) The asset depreciation period selected by the taxpayer for each vintage account; (iv) The first-year convention adopted by the taxpayer for the taxable year of election * * *; (viii) A reasonable description of any eligible property for which the taxpayer was not required or permitted to make an election because of the special rules of paragraph (b)(5)(v) or (b)(6) or paragraph (e)(3)(i) of this section; (ix) A reasonable description of all "section 38 property" excluded under paragraph (b)(5)(iv) of this section from the election to apply this section; and (x) Such other information as may reasonably be required. (See paragraph *44 (b)(4)(iii)(a) of this section for special election by certain public utilities.) Forms [i.e., Form 4832] will be provided for submission of the information required and an election to apply this section will not be rendered invalid under this subparagraph so long as there is substantial compliance with the requirements of this subparagraph. [Emphasis added.] Given petitioner's position and the foregoing regulation, we observe that the issue before us is a very narrow one, specifically, whether the information provided on petitioner's 1971 return was in "substantial compliance" with section 1.167(a)-11(f). Petitioner has not challenged the reasonableness of such regulation, which must be sustained unless it is unreasonable or plainly inconsistent with the statute. Commissioner v. South Texas Lumber Co.,333 U.S. 496 (1948); Casel v. Commissioner,79 T.C. 424, 433-434 (1982). Section 1.167(a)-11(c)(2)(i), Income Tax Regs., provides that a taxpayer who seeks to apply the half-year convention "must specify the convention" which he is adopting. The regulation refers the taxpayer to section 1.167(a)-11(f), Income Tax Regs., for the information *45 required in making the election. Petitioner's contention that the information supplied in his 1971 return substantially complied with section 1.167(a)-11(f) is unacceptable. The information called for in section 1.167(a)-11(f)(2) is not present on petitioner's 1971 return, and it was never furnished as part of the record in this case. Not even close scrutiny of petitioner's 1971 return reveals that he ever intended to elect the half-year convention. Petitioner did not attach of Form 4832 to his 1971 return, and his return for that year lacks even a "home made" listing of the information specified in section 1.167(a)-11(f)(2).The word "election" is conspicuously absent from the depreciation section of petitioner's Schedule F (Form 1040) for 1971, as is any mention that the half-year convention has been employed. Respondent maintains, and we agree, that one can only infer the nature of the depreciation deduction shown on petitioner's 1971 return by making various assumptions about what was intended and plugging the numbers into the resulting formula until the return figure of $4,429 is reached. We do not think that respondent should be put to such a burden when timely compliance *46 by petitioner with the applicable regulations would not have been even remotely burdensome. In fact, respondent's specifications as to the manner in which the election is to be made are, as reflected in section 1.167(a)-11(f), Income Tax Regs., eminently reasonable. [19] Consequently, we hold for respondent. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Monesi's first name does not appear in the record.↩
3. The prospectus states that "[t]he * * * description of federal income tax consequences assumes that herd purchasers will be deemed for federal income tax purposes to be engaged in the trade or business of farming (specifically, the holding of cattle for breeding purposes) rather than being considered mere passive investors." ↩
4. The analysis was "based upon the assumption that the herd owner will be entitled to the most favorable tax treatment presently available under applicable tax laws." The prospectus recommended "that each potential purchaser consult his own tax advisor in order that the effects of a purchase of a herd hereunder may be determined with specific reference to his own tax situation and any changes in the applicable law." ↩
5. The pro forma investment analysis set forth in the prospectus, absent the qualifying assumptions stated therein, is provided below for illustrative purposes. Pro Forma Investment Analysis (1 Herd-10 Cows) HERD PURCHASED IN DECEMBER Herd
Cumulative
Owner's
Number of
Annual
Available Tax Deductions
Calendar
Installments
Cash
Year
Paid
Outlay
Depreciation
Interest
Total
(1)
(2)
(3)
(4)
(5)
(6)
1
0
$5,000
$9,167
$9,167
2
12
3,300
8,611
2,061
10,672
3
24
3,300
5,741
1,971
7,712
4
36
3,300
3,827
1,875
5,702
5
48
3,300
2,551
1,772
4,323
6
60
3,300
2,402
1,661
4,063
7
72
6,600
1,201
1,436
2,637
8
84
18,522
846
846
$46,622
$33,500
$11,622
$45,122
Investment Cost After Tax Deductions
Herd
Owner's
50% Bracket
60% Bracket
70% Bracket
Calendar
Year
Annual
Cumulative
Annual
Cumulative
Annual
Cumulative
(1)
(7)
(8)
(9)
(10)
(11)
(12)
1
$416 $416 $ (500)
$ (500)
$ (1,417)
$ (1,417)
2
(2,036)
(1,620)
(3,103)
(3,603)
(4,170)
(5,587)
3
(556)
(2,176)
(1,327)
(4,930)
(2,098)
(7,685)
4
449 (1,727)
(121)
(5,051)
(692)
(8,377)
5
1,139 (588)
706 (4,345)
274 (8,103)
6
1,268 680 862 (3,483)
455 (7,648)
7
5,282 5,962 5,018 1,535 4,755 (2,893)
8
18,099 24,061 18,014 19,549 17,930 15,037 $24,061 $24,061 $19,549 $19,549 $15,037 $15,037 ↩
Herd
Estimated
Estimated
Owner's
Progeny
Size
Calendar
Added to
of
Year
Herd
Herd
(1)
(13)
(14)
1
10
2
4
14
3
5
19
4
5
24
5
7
31
6
9
40
7
12
52
8
15
67
57
67
6. The maintenance contract provided that it could be extended for an additional 5 years at petitioner's option. ↩
7. In the event that petitioner decided to extend the maintenance contract for an additional 5-year term, CCR reserved the right to charge petitioner a cash maintenance fee "at the then prevailing rates being charged herd owners by Calderan-Curran," rather than accepting progeny from petitioner's herd as payment.↩
8. The term "net price" refers to the amount received by CCR after allowing for underwriting discounts and commissions totalling 9 percent of the purchase price.↩
9. In January 1976, petitioner began making his monthly payments of $275 to the bank, and thereby paid the bank a total of $2,475 through September of that year.↩
10. The four alternatives, all of which required petitioner to bring his installment payments current through August 30, 1976, were as follows: (1) removal of herd upon payment of 50 percent of principal indebtedness as of August 30, 1976 payment; (ii) transfer entire herd to bank and make payment of 50 percent of principal indebtedness as of August 30, 1976 payment, less credit for cattle transferred ($165 per head for polled Herefords); (iii) pay note in full, and (iv) transfer the progeny of the herd to bank and make payment of 50 percent of principal indebtedness as of August 30, 1976, less credit for progeny transferred to bank ($140 per head for polled Herefords).↩
11. See section 179. ↩
12. With respect to property placed in service after 1980, the Class Life Asset Depreciation Range System has been replaced by the Accelerated Cost Recovery System (ACRS). ↩
13. Form 4832, entitled "Class Life Asset Depreciation Range… System" was the form provided by respondent to taxpayers who sought to elect ADR and apply the provisions of section 1.167(a)-11, Income Tax Regs.↩ Line 54 of Schedule F (Form 1040) contains the printed words "Depreciation from Form 4832" and provides a space for taxpayers to list the depreciation that they claimed (under ADR) on Form 4832.
14. Petitioner's 1973 return was not selected by respondent for examination. The parties have stipulated that the statute of limitations with respect to such year is closed pursuant to section 6501.↩
15. Respondent's determinations were based on allowing petitioner a 7-year depreciable life for his cattle, use of the doubledeclining balance method of depreciation, and additional first year depreciation in 1971. As a result of his determinations, respondent allowed petitioner depreciation deductions with respect to his herd totalling $2,732.31 for 1971 and 1972. The parties have agreed that any adjustments to petitioner's 1973 taxable year are closed by the statute of limitations, and since petitioner claimed depreciation of $5,420.21 with respect to his herd on such return, respondent determined that no part of the depreciable basis of $6,180 remained to be deducted for future years. Finally, we note that respondent determined that petitioner is entitled to an investment tax credit in the amount of $432.60 (i.e., 7 percent of $6,180) for 1971, and respondent did not propose any adjustment to the amount of interest deducted on petitioner's returns with respect to the payments made on his promissory note.↩
16. The fact that petitioner negotiated a reduction of the original stated price of $35,000 to $23,554.20 in 1976 does not retroactively affect his basis for the depreciation deductions and investment tax credit claimed during the years in issue. Mayerson v. Commissioner,47 T.C. 340, 354 (1966); Blackstone Theatre Co. v. Commissioner,12 T.C. 801, 804-805↩ (1949). 17. Respondent did not raise as an issue the treatment of petitioner's payments to CCR in excess of the cost of the herd (i.e., $6,180) and interest payments. In the statutory notice, respondent took the position that such excess payments constituted deductible care and maintenance expenses.↩
18. We note that we are quoting from the original language of section 1.167(a)-11(f), Income Tax Regs., as adopted by T.D. 7128↩ on June 22, 1971. Although subsequent amendments to that regulation have changed portions of the original language, neither party maintains, and we agree, that the amendments have not changed the meaning of the originally enacted regulation insofar as it pertains to the issue before us.
19. See Horowitz v. Commissioner,T.C. Memo. 1968-74↩.