ESTATE OF MILDRED C. NAZARIAN, Deceased, SIPPI NAZARIAN, Executor, and SIPPI NAZARIAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
ESTATE OF NAZARIAN v. COMMISSIONER
Docket Nos. 4876-71; 5389-72; 3224-73; 5737-74; 4230-77; 5779-78; 7971-79; 9598-80.
United States Tax Court
T.C. Memo 1989-179; 1989 Tax Ct. Memo LEXIS 182; 57 T.C.M. (CCH) 188; T.C.M. (RIA) 89179; April 19, 1989
Louis E. Goebel, for the petitioners. Erik P. Doerring, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: These consolidated cases were assigned to Special Trial Judge Hu S. Vandervort pursuant to the provisions of section 7456(d) of the Internal Revenue Code (redesignated section 7443A(b) by section 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755), and Rule 180 et seq. [1] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. *185 OPINION OF THE SPECIAL TRIAL JUDGE VANDERVORT, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Section 6653(a)
Docket No.
Year
Deficiency
Addition to Tax
4876-71
1967
$   396,962.33
$ 19,848.12
5389-72
1968
352,297.23
17,614.86
3224-73
1969
1,484,139.58
74,206.98
5737-74
1970
148,379.00
7,419.00
5737-74
1971
38,316.00
1,916.00
5737-74
1972
52,453.00
2,623,00
4230-77
1973
14,678.00
733.00
5779-78
1974
14,476.00
724.00
7971-79
1975
2,691.00
--
9598-80
1976
8,819.00
--
After concessions, the issues presented are: A. Whether respondent's notices of deficiency for 1967, 1968, and 1969 were arbitrary so as to preclude respondent from relying on the presumption of correctness and shift the burden of going forward with evidence to respondent. B. Whether petitioners must recognize taxable gain from the sale of a convalescent hospital in 1969. C. Whether petitioners must recognize income from the exercise of a stock option in 1969. D. Whether petitioners received unreported taxable *186 income in 1968, 1969, 1970, 1971, and 1972. E. Whether petitioners are entitled to deduct interest expense for taxable years 1969 through 1976. F. Whether petitioners must recognize interest income from certificates of deposit in 1969. G. Whether petitioners have properly established their basis in certain real estate sold in 1970. H. Whether petitioners are entitled to short-term and long-term capital loss carryovers in 1970 and 1971. I. Whether petitioners are entitled to a bad debt deduction in 1970. J. Whether petitioners are liable for additions to tax under section 6653(a) for 1967 through 1974. FINDINGS OF FACT Some of the facts have been stipulated and are so found. This reference incorporates the stipulation of facts and attached exhibits. Petitioners resided in Palm Springs, California when they filed their petitions. Petitioner Mildred C. Nazarian died in 1982 and her husband, petitioner Sippi Nazarian (Nazarian), was appointed executor of her estate. Mr. Nazarian and Walter McFadden (McFadden) each contributed $ 12,500 to a partnership formed in 1957 to own and operate a convalescent hospital in Artesia, California. The partnership purchased *187 a 42 bed hospital facility for $ 150,000, represented by a $ 25,000 down payment and a $ 125,000 purchase money note. Mr. Nazarian managed the hospital. Mr. McFadden did not participate in the day to day operation of the hospital. In 1962 the partnership obtained a $ 250,000 Small Business Administration loan from the Golden State Bank. The proceeds were used to construct an additional building and to improve the existing facility. By 1963 the hospital had 102 beds. On August 2, 1963, Mr. Nazarian and Mr. McFadden formed a California Corporation named Twin Palms Sanitarium, Inc. (Twin Palms). The partners transferred all the partnership's assets to this newly created corporation and each partner received 50 percent of all outstanding Twin Palms' stock. John McTernan (McTernan), a California attorney, served as counsel to Twin Palms. Mr. McTernan's law partner was Ben Margolis, the brother of Harry Margolis (Margolis), a California attorney who specialized in tax planning. Harry Margolis represented Mr. Nazarian and advised him on tax planning matters. During 1964, a conflict developed between Mr. Nazarian and Mr. McFadden over the control of Twin Palms. Mr. McFadden *188 objected to the proposed issuance of Twin Palms stock to Flora Logan, a key hospital employee. Mr. McFadden feared that Ms. Logan and Mr. Nazarian would have voting control of Twin Palms. On the advice of Mr. Margolis, Mr. Nazarian arranged to have a foreign trust established to purchase Mr. McFadden's Twin Palm's stock. Mr. Nazarian gave $ 1,000 to Virginia Nazarian, his sister-in-law, and instructed her to deposit the sum into a bank account. These funds later served as the corpus of Mr. Nazarian's "family" trust. Under the trust instrument, dated May 14, 1965, Virginia Nazarian was named as settlor and the Aruba Bonaire Curaco Trust Company (Aruba Bonaire), a Bahamas Corporation, was trustee. Aruba Bonaire was an existing corporation which was controlled by the Margolis law office. Neither Virginia Nazarian nor any member of her family, other than Mr. Nazarian, benefitted from this trust. On March 12, 1965, Mr. McFadden executed a document to purportedly sell all of his Twin Palms stock to Aruba Bonaire for $ 35,000. A few months earlier, in December 1964, Mr. Nazarian had applied for a $ 35,000 loan from the Bank of Pico Rivera. He received the loan proceeds on March 30, 1965, and *189 Mr. McFadden was paid for his stock interest on April 9, 1965. On April 1, 1965, Mr. McFadden executed a document with Twin Palms under which he was to receive $ 110,000 for his agreement to refrain from future competition against Twin Palms. From April 1965 through June 1967, Mr. McFadden received $ 1,000 per month under this agreement. On June 7, 1967, Mr. McFadden received a $ 37,528 payment from Associated Convalescent Enterprises (Associated). The check from Associated was signed by Mr. Nazarian as a member of Associated's board of directors. Associated was controlled by the Margolis law office. Mr. Nazarian also executed a document in March 1965, to sell his Twin Palms stock to Aruba Bonaire for $ 35,000. Mr. Nazarian stated at trial that he did not possess an ownership interest in Twin Palms after March 1965. Petitioners' 1965 joint return reflects that the Twin Palms stock was sold for a gross sales price of $ 35,000 with an adjusted basis of $ 42,324, and accordingly reported a net loss of $ 7,324. Mr. Nazarian's June 30, 1965, financial statement contains a reference to his ownership of 85 percent of the stock in Twin Palms valued at $ 330,000. David Menkes, *190 Mr. Nazarian's accountant, prepared this financial statement which was based entirely on information supplied by Mr. Nazarian and was not independently verified. On June 29, 1967, the Golden State Bank issued a $ 32,062 certificate of deposit to Associated. On June 29, 1967, Elaine Fishel, president of Associated and an attorney associated with the Margolis law office, endorsed the certificate of deposit to Mr. McFadden. The certificate was personally guaranteed by Mr. Nazarian. During 1966, Mr. Margolis purportedly made arrangements for Mr. Nazarian to obtain a $ 400,000 loan from World Minerals, N.V. to be used for the construction of additional improvements to the convalescent hospital facility. Mr. Nazarian received $ 350,000 from North American Financial Corporation (North American) between January and April 1966. These funds were spent on additions to the hospital, so that by early 1967, the facility had 222 beds. During June 1967, Aruba Bonaire purportedly dissolved Twin Palms and distributed its assets. A certificate of dissolution was filed with the California Secretary of State's office, and a copy of the minutes from a purported "special meeting" of Twin Palms' *191 board of directors recites that a plan of liquidation was adopted. The assets of Twin Palms were transferred to Mr. McTernan as trustee for Aruba Bonaire. Mr. McTernan was also a member of the Twin Palms board of directors at the time the purported decision to dissolve the corporation was made. On June 15, 1967, two deeds were filed in the Los Angeles County records office which recite that certain real estate located in Artesia, California, and related personal property, were transferred from Twin Palms to Mr. McTernan as trustee for Aruba Bonaire. These deeds do not specifically describe the property which was conveyed. In July 1967, Aruba Bonaire purported to sell the assets received in the liquidation of Twin Palms to Associated. The purchase agreement provides a total consideration of $ 2,125,000 which was to be paid in principal part through an unsecured promissory note of $ 1,872,815. A deed was filed in the County of Los Angeles for the State of California which recites that Aruba Bonaire transferred certain real estate to Associated. The deed, however, does not describe the property conveyed. On August 1, 1967, Associated purportedly leased the hospital facility *192 to Artesia Convalescent Hospital Enterprises (Artesia), an entity which had been incorporated that same day. Artesia was organized by the Margolis law office. Mr. Nazarian owned 80 percent of Artesia's outstanding stock and signed the purported lease as Artesia's president. [2] Mr. Nazarian retained managerial control over the hospital after Twin Palms had been liquidated, and the hospital was sold to Associated and leased to Artesia. On July 2, 1968, Associated entered into an agreement with Consolidated Convalescent, Inc. (Consolidated) to sell the hospital for $ 2,100,000. Consolidated was a wholly-owned subsidiary of Metrocare Enterprises, Inc. (Metrocare), a publicly-owned corporation. The purported lease between Associated and Artesia was cancelled on January 21, 1969. Consolidated transferred $ 2,100,000 into an escrow account managed by Title Insurance Trust Company of Los Angeles (Title Insurance). Under the escrow instructions, $ 341,347.61 was transferred to various creditors and holders of recorded encumbrances. The Small Business Administration loan made to the Nazarian/McFadden *193 partnership was repaid. On February 6, 1969, Title Insurance transferred $ 1,733,985.31 from the escrow account to Mr. McTernan, the representative of Associated. This transfer was the final step in Consolidated's acquisition of the hospital. On the same day, February 6, 1969, Associated transferred $ 1,500,000 from Union Bank of Los Angeles, California to an account in the name of World Minerals, N.V. in Curacao, Netherlands Antilles. World Minerals, in turn, transferred $ 1,200,000 to a domestic bank account for Mr. Nazarian's benefit. Mr. Nazarian's June 24, 1970, financial statement contains a reference to his ownership of a beneficial interest in Aruba Bonaire valued at $ 512,000. This document was prepared by Mr. Menkes and was based upon unverified information provided by Mr. Nazarian. On February 12, 1969, twelve certificates of deposit were issued by Golden State Bank in the name of World Minerals, N.V. with interest payable to Mr. Nazarian. He received $ 27,666.20 from these certificates of deposit during 1969, however, he reported only $ 70.00 of interest income on his 1969 Federal income tax return. He contends that the remainder of the interest on the certificate *194 of deposit was received on behalf of World Minerals. On October 25, 1968, Metrocare granted Mr. Nazarian an option to purchase up to 10,000 shares of its authorized, but unissued common stock at $ 0.15 per share. According to the stock option agreement, Mr. Nazarian was able to exercise the option only if Metrocare was furnished with marketable title to the convalescent hospital. The option agreement states that it is a personal right of Mr. Nazarian and that any assignment, transfer, pledge, hypothecation or other alienation without the prior written consent of Metrocare shall be null and void. The agreement also contained a statement that the shares of stock to be issued to Mr. Nazarian were not to be registered under the Securities Act of 1933 and that Mr. Nazarian represented that he was acquiring the stock for investment purposes and not with a view towards resale. Mr. Nazarian also agreed that he would enter into a separate agreement with Metrocare, at their request, under which he would be precluded from transferring the shares for a period of time to be determined by Metrocare, but not to exceed two years. The option agreement further states that the certificates to be *195 issued to Mr. Nazarian may, at the option of Metrocare, bear a legend providing that the stock was issued without registration under the Securities Act of 1933 and may not be transferred unless they are so registered. Metrocare issued a prospectus for its initial common stock offering on January 28, 1969, and issued a prospectus, dated August 12, 1971, for its second common stock offering. This latter prospectus stated that Mr. Nazarian exercised his stock option in March 1969, when the market price of the stock was $ 12.00 per share. An SEC form entitled "Initial Statement of Beneficial Ownership of Securities" was signed by Mr. Nazarian and states that, as of August 10, 1970, he held 10,000 shares of Metrocare stock on behalf of Associated. Mr. Nazarian's June 24, 1970, financial statement indicates that he owned Metrocare stock worth $ 200,000. During 1969, Mr. Nazarian wrote checks to himself totaling $ 100,618.50 from a Twin Palms' account at Golden State Bank. Mr. Nazarian also received checks from the Anglo Dutch Capital Company (Anglo Dutch), a corporation organized by the Margolis law office, in the amounts of: $ 100,000 in 1968, $ 79,000 in 1969, $ 192,000 in 1970, *196 $ 10,000 in 1971, and $ 84,337 in 1972. Mr. Nazarian also made payments to Associated represented by checks drawn on a Twin Palms account at the Golden State Bank in the amounts of $ 62,936.50 in 1967, $ 265,560 in 1968, and $ 92,783 in 1969. Petitioners deducted interest expenses allegedly incurred between 1969 and 1976 on loans from Anglo Dutch and Antigua Banking Limited (Antigua Banking). Antigua Banking was organized and controlled by the Margolis law firm. Mr. Nazarian's signature appears on 27 alleged promissory notes payable to Anglo Dutch or Antigua Banking, only seven of which are marked "cancelled." The remaining promissory notes have a total face value of $ 1,187,184. The record contains no evidence in the form of cancelled checks or cash receipts to substantiate the payment of interest to Anglo Dutch or Antigua Banking. When petitioners allegedly sold their Twin Palms stock interest in 1965, they claimed a $ 7,324 long-term capital loss. Petitioners deducted $ 1,000 of this amount in 1965 and then carried the balance forward to the taxable years 1966, 1967, and 1969 and deducted the following amounts: $ 1,000, $ 1,000, and $ 47, respectively. In 1970, petitioners *197 claimed a deduction of $ 4,277 representing the balance of the long-term capital loss carryover from 1965. In 1968 petitioners reported a $ 3,606 short-term capital loss from the alleged disposition of a stock interest in "Vista Industries." Petitioners applied $ 1,000 of this loss to the taxable year 1968. Petitioners carried $ 1,080 forward to 1969, $ 1,526 to 1970 and $ 267 to 1971 as a short-term capital loss carryover. [3]
Mr. Nazarian co-signed a $ 10,000 promissory note with the owner of a gasoline service station located near the Twin Palms convalescent hospital. He co-signed the note so that the gas station owner would agree to sell an interest in his business to Mr. Nazarian's brother who was then unemployed. The owner of the gas station died shortly thereafter and the holder of the note called Mr. Nazarian for the remaining balance of $ 8,000 which he paid. Mr. Nazarian was appointed executor of the deceased gas station owner's estate. Mr. Nazarian attempted to secure reimbursement for the note payment from *198 the deceased's safety deposit box but was unsuccessful because his widow had "already been there." Mr. and Mrs. Nazarian deducted the $ 8,792 payment of $ 8,000 principal and $ 792 interest on the note as a bad debt loss on their 1970 joint return. Petitioners reported the sale of a "mountain home" on their 1970 joint return. They reported a basis in the property equal to their gross sales proceeds of $ 35,000, and thus reported no taxable gain. OPINION After reviewing the entire record, we find that: A. Respondent's notices of deficiency are not arbitrary for the years in question and petitioners have the burden to prove the substance of the transactions involved. B. Petitioners must recognize taxable gain from the sale of the hospital facility in 1969. C. Petitioners must recognize taxable income from the exercise of Metrocare stock options in 1969. D. Petitioners must recognize taxable income received from Anglo Dutch in the years 1968, 1969, 1970, 1971, and 1972, and from Artesia in 1969. E. Petitioners are not entitled to deduct interest payments made to Anglo Dutch in years 1969, 1970, 1971, 1972, 1973, and 1974 or interest payments made to Antigua Banking *199 in years 1975 and 1976. F. Petitioners must recognize taxable interest income from certificates of deposit in 1969. G. Petitioners have failed to establish their basis in real estate sold in 1970 and must recognize the entire proceeds of the sale as gain. H. Petitioners are not entitled to short-term and long-term capital loss carryovers for 1970 and 1971. I. Petitioners are not entitled to a bad debt deduction for 1970. J. Petitioners are liable for additions to tax under section 6653(a) for taxable years 1967 through 1974. A. Respondent's Notices of Deficiency
Petitioners contend that the notices of deficiency for 1967, 1968, and 1970 are punitive and arbitrary, and therefore the burden of going forward with evidence should be shifted to respondent. Respondent takes the position that the notices of deficiency are based on substantive evidence and are entitled to their usual presumption of correctness. Respondent's statutory notices of deficiency ordinarily enjoy a presumption of correctness which places the burden of proof, and the burden of going forward with evidence on petitioners. Welch v. Helvering,290 U.S. 111 (1933); Bernuth v. Commissioner,470 F.2d 710, 714 (2d Cir. 1972), *200 affg. 57 T.C. 225 (1971); Rule 142(a). Respondent can be precluded from relying on the presumption of correctness by a showing that the statutory notice of deficiency is arbitrary, thus shifting the burden of going forward with evidence to respondent. Helvering v. Taylor,293 U.S. 507 (1935); Jackson v. Commissioner,73 T.C. 394, 401 (1979). By requesting a finding that the notices of deficiency are arbitrary, petitioners are in effect asking this Court to probe the underpinnings of these notices. Dellacroce v. Commissioner,83 T.C. 269, 280 (1984); Riland v. Commissioner,79 T.C. 185, 201 (1982). As a general rule, this Court will not look behind a statutory notice to scrutinize the quality of the evidence that respondent used to make his determination. Llorente v. Commissioner,74 T.C. 260, 264 (1980), revd. in part 649 F.2d 152 (2d Cir. 1981); Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 327 (1974). If, however, a taxpayer can show in an unreported income case that respondent's determination is without foundation and not based on substantive *201 evidence, then the Ninth Circuit (the Circuit to which these cases are appealable) has held that this Court may look behind a notice of deficiency and may find the determination arbitrary. Weimerskirch v. Commissioner,596 F.2d 358 (9th Cir. 1979). The Weimerskirch case, however, represents a limited exception to the general rule that notices of deficiency are presumptively correct. Karme v. Commissioner,673 F.2d 1062 (9th Cir. 1982). Unlike Weimerskirch v. Commissioner, supra, the deficiencies in the instant cases do not arise from unreported illegal income, but largely from disallowed deductions claimed by petitioners. Moreover, respondent has offered abundant evidence with regard to the unreported income items in dispute. Petitioners assert that respondent's notices are arbitrary because of the magnitude of the deficiencies, and because the notices "ignore reality" and "well-accepted" approaches to tax liability. Petitioners fail, however, to support these contentions through substantive evidence. The burden of proof in this Court requires petitioners to demonstrate the merits of their argument by a preponderance *202 of the evidence. Rapp v. Commissioner,774 F.2d 932 (9th Cir. 1985); Rockwell v. Commissioner, supra.Respondent's determinations are neither arbitrary nor punitive, and petitioners have the burden of going forward with evidence, as well as the burden of proof. B. 1969 Disposition of the Convalescent Hospital to Consolidated
Respondent determined that petitioners received income from the sale of the convalescent hospital to Consolidated in 1969. Petitioners claim to be unaffected by the sale of the hospital because Mr. Nazarian did not possess an ownership interest in the hospital after the transfer of his Twin Palms stock to Aruba Bonaire in 1965. A person has the right to arrange his affairs in such a manner as to reduce his Federal income tax liability, but the substance of a transaction must control over its form in determining tax consequences. Gregory v. Helvering,293 U.S. 465 (1935). The form of the transactions show that Aruba Bonaire acquired all outstanding stock interests in Twin Palms in March 1965 and that Mr. Nazarian served as an officer and director, but was not a shareholder. In substance, however, Aruba Bonaire *203 served as a conduit through which Mr. Nazarian purchased Mr. McFadden's Twin Palms stock. It was Mr. Nazarian who obtained a loan to purchase Mr. McFadden's stock and personally guaranteed the endorsement of a certificate of deposit to Mr. McFadden. There is no evidence that Mr. Nazarian actually conveyed his stock interest to Aruba Bonaire or that he actually received $ 35,000 from Aruba Bonaire. Also, Mr. McFadden's stock was transferred to an entity controlled by Mr. Margolis, Mr. Nazarian's tax attorney. We find that the purported acquisition of Twin Palms by Aruba Bonaire lacked substance. It was designed to create the appearance of a divestment by Mr. Nazarian of his interest in the convalescent hospital, while he retained managerial control over its operation. In substance, Mr. Nazarian did not relinquish his stock interest in Twin Palms, but actually acquired 100 percent of the Twin Palm's stock by purchasing Mr. McFadden's share. Petitioners contend that within a six week period in 1967, Twin Palms was dissolved by Aruba Bonaire, its assets were liquidated, and the hospital was transferred to Mr. McTernan as trustee for Aruba Bonaire. The hospital was then sold to *204 Associated, and finally leased to Artesia, in which Mr. Nazarian was an 80-percent shareholder. It is unclear whether the special meeting at which the Twin Palms directors adopted the plan of dissolution actually took place and there is no evidence to suggest the minutes reflect what actually transpired. Mr. McTernan's dual positions as director of Twin Palms and trustee of Aruba Bonaire suggests that the dealings were not at arm's length. Additionally, the purported sale of the hospital from Aruba Bonaire to Associated was to be financed by an unsecured promissory note for $ 1,872,815. There is no evidence that Associated made payments to Aruba Bonaire on the note. The purported dissolution, liquidation, sale to Associated, and lease to Artesia all lacked substance and were designed to obscure the economic reality that Mr. Nazarian owned the convalescent hospital. These transactions were intended to insulate petitioners from the tax consequences of the anticipated future sale of the hospital. There is no dispute that Consolidated paid $ 2,100,000 for the convalescent hospital. The form of the above described transaction suggests that the hospital was owned by Associated at *205 the time of the sale to Consolidated, and that the proceeds of the sale were channelled to an off-shore entity to escape taxation in the United States. Petitioners possessed a 100 percent ownership interest in the hospital and Associated's disposition of the hospital triggered taxable consequences for petitioners. The taxable gain realized on a disposition of an asset equals the amount received by a taxpayer, less the adjusted basis. Section 1001. Petitioners' original cost basis in the convalescent hospital was the $ 12,500 contributed to the Nazarian/McFadden partnership. This figure must be increased by $ 35,000 representing petitioners' cost of acquiring Mr. McFadden's Twin Palms stock interest in 1965. Section 1016. Thus, petitioners adjusted basis in the liquidated assets of Twin Palms equals $ 47,500. Petitioners constructively received $ 1,733,988 from Associated's disposition of the hospital. World Minerals transferred $ 1,200,000 of the sale proceeds received by Associated to a domestic bank account for Mr. Nazarian's benefit, and retained $ 512,000 representing a beneficial interest of Mr. Nazarian in Aruba Bonaire. The gain petitioners realized on the transaction *206 is, therefore, $ 1,733,988 less $ 47,500, which equals $ 1,686,488. Respondent concedes that Mr. Nazarian is entitled to the 50 percent long-term capital gain deduction, thus the net adjustment to petitioners' 1969 income is $ 843,244.00. Section 1211. C. Metrocare Stock Options
Respondent determined that petitioners realized taxable income in the amount of $ 120,000 in 1969 upon the exercise of an option for the purchase of Metrocare stock by Mr. Nazarian. Respondent contends that Mr. Nazarian was granted the option for his services. Petitioners contend that Mr. Nazarian accepted the stock option as a trustee for Associated and that he did not exercise the option nor know who did exercise the option, if in fact it was exercised. Mr. Nazarian was elected as a vice-president of Metrocare and was appointed to its Board of Directors in July 1968. Metrocare granted Mr. Nazarian the option to purchase 10,000 shares of Metrocare common stock as an employment inducement. The granting of this stock option was memorialized in an agreement between Metrocare and Mr. Nazarian, dated October 25, 1968. The agreement provided that Metrocare proposed to grant Mr. Nazarian 10,000 *207 shares of its authorized but unissued common stock at the price of $ .15 per share. The stock was to be issued to Mr. Nazarian only in the event that Associated furnished marketable title to the Twin Palms facility and was not otherwise in default under the terms of its agreement with Consolidated. If these conditions were met, Mr. Nazarian could then exercise the stock option upon the payment of $ .15 per share. The agreement contained a statement that the shares of stock to be issued to Mr. Nazarian would not be registered under the Securities Act of 1933 and that Mr. Nazarian represented that he was acquiring the stock for investment purposes and not for resale. The agreement further stated that the stock certificates to be issued to Mr. Nazarian may, at the option of Metrocare, bear an inscription that the certificates were issued without registration under the Securities Act of 1933 and that they may not be offered or sold unless they are registered under the Securities Act of 1933 or Metrocare is presented an opinion of counsel acceptable by Metrocare that registration is not necessary. The agreement also recited that Mr. Nazarian would agree to enter into an additional *208 agreement, upon the request of Metrocare, to not sell or otherwise dispose of his stock without the prior written consent of Metrocare or any underwriter for the corporation for a period of time (not exceeding two years) following any initial public offering. The option agreement stated that the option is a personal right of Mr. Nazarian and that any assignment, transfer, pledge, hypothecation, or other alienation without the prior written consent of Metrocare was not permitted. Metrocare issued a prospectus for its initial common stock offering on January 28, 1969. Metrocare issued a prospectus for a second public offering of common stock on August 12, 1971. During the trial in these cases, Mr. Nazarian attempted to contradict the statements set forth in this latter Metrocare prospectus relative to his exercise of the stock option. Mr. Nazarian identified his signature on the Metrocare stock option agreement, the agreement which gave him the personal and exclusive option to purchase the shares. Mr. Nazarian testified, however, that he did not know who exercised the option. Mr. Nazarian further testified that he never paid any amounts under the option agreement and that he *209 never acquired a beneficial interest in the 10,000 shares to be issued under the agreement. Mr. Nazarian's accountant, Mr. Menkes, prepared a Statement of Financial Condition which states that as of June 24, 1969, Mr. Nazarian owned common stock in Metrocare valued at $ 200,000. Mr. Menkes prepared the Statement of Financial Condition from information submitted by Mr. Nazarian. Mr. Nazarian testified that the stock interest represented in the Statement of Financial Condition was from Metrocare shares purchased on the open market and that the purchase of these shares was unrelated to the shares which were to be issued under the stock option agreement. Petitioners failed to provide any evidence to corroborate Mr. Nazarian's declaration that he purchased the shares on the open market. No stock certificates were offered into evidence and petitioners failed to adduce testimony from a Metrocare official or other knowledgeable individual who could lend some credence to Mr. Nazarian's assertions. The record contains a copy of a document signed by Mr. Nazarian and purportedly filed with the Securities and Exchange Commission (SEC) which recites that he held 10,000 shares of Metrocare *210 stock on behalf of Associated. Petitioners offered this document to support their contention that any taxable income resulting from the granting of the stock option or its exercise should be taxable to Associated. The document, however, contradicts Mr. Nazarian's testimony that he does not know who exercised the option. The document is merely an SEC form signed by Mr. Nazarian. Further, there is no evidence in the record to establish that the document was actually filed with the SEC or that the statements made therein are true and correct. Petitioners have the burden of proving that they did not receive taxable income from the receipt or exercise of this stock option. Welch v. Helvering, supra; Rule 142(a). Other than Mr. Nazarian's self-serving and unsubstantiated testimony, petitioners have offered little evidence to support their claim. Accordingly, petitioners have failed to meet their burden of proof. We find that Mr. Nazarian was granted a stock option on October 25, 1968, which was exercised according to the terms of the option in March 1969. We must now determine the taxable amount and the year in which it is taxable to Mr. Nazarian. The taxation *211 of stock options entered into prior to April 22, 1969, is generally determined under section 61 unless otherwise specified by statutory authority. [4] See Commissioner v. LoBue,351 U.S. 243 (1956); Commissioner v. Smith,324 U.S. 177 (1945); section 1.61-2(d), Income Tax Regs.Section 1.612(d)(1), Income Tax Regs., provides: If services are paid for other than in money, the fair market value of the property or services taken in payment must be included in income. If the services were rendered at a stipulated price, such price will be presumed to be the fair market value of the compensation received in the absence of evidence to the contrary. However, for special rules relating to certain options received as compensation, see section 1.61-15 and section 421 and the regulations thereunder. Under section 1.61-15, Income Tax Regs. *212 , the taxation of stock options is to be determined in accordance with the provisions of section 1.421-6, Income Tax Regs.
Section 1.421-6(c), Income Tax Regs., provides in part: (1) If there is granted an option to which this section applies and which has a readily ascertainable fair market value * * * at the time the option is granted, the employee in connection with whose employment such option is granted realizes compensation at such time in an amount equal to the excess, if any, of such fair market value over any amount paid for the option. If an option to which this section applies does not have a readily ascertainable fair market value at the time the option is granted, the time when the compensation is realized and the amount of such compensation shall be determined under paragraph (d) of this section. (2) Although options may have a value at the time they are granted, that value is ordinarily not readily ascertainable unless the option is actively traded on an established market. If an option is actively traded on an established market, the fair market value of such option is readily ascertainable for purposes of this section * * *. (3)(i) When an option is not actively *213 traded on an established market, the fair market value of the option is not readily ascertainable unless the fair market value of the option can be measured with reasonable accuracy. For purposes of this section, if any option is not actively traded on an established market, the option does not have a readily ascertainable fair market value when granted unless the taxpayer can show that all of the following conditions exist: (a) The option is freely transferable by the optionee; (b) The option is exercisable immediately in full by the optionee; (c) The option or the property subject to the option is not subject to any restriction or condition (other than a lien or other condition to secure the payment of the purchase price) which has a significant effect upon the fair market value of the option or such property; and (d) The fair market value of the option privilege is readily ascertainable in accordance with subdivision (ii) of this subparagraph. Pursuant to the above regulation, we must determine whether the option had a readily ascertainable fair market value when it was granted. If we so determine, then the value of the option stock would be taxable to Mr. Nazarian on *214 the date the option was granted in 1968. Section 1.421-6(c), Income Tax Regs.
Petitioners have introduced no evidence, however, that the option had a readily ascertainable fair market value on October 25, 1968, the date the option was granted to Mr. Nazarian. Section 1.421-6(c), Income Tax Regs. The option was not actively traded on an established market, the option was not freely transferable, the option could not be exercised immediately, and the option was subject to restrictions. Section 1.421-6(c), Income Tax Regs. Accordingly, the value of the option is not taxable to Mr. Nazarian when it was granted. Respondent determined that the compensatory element of the option, that is the difference between the option price and the fair market value of the stock received, was taxable when the option was exercised as ordinary income. Where the option fails to have an ascertainable fair market value at the time it is granted, the taxation of the option is determined under section 1.421-6(d)(1), Income Tax Regs.Section 1.421-6(d)(2)(i), Income Tax Regs., provides that if the stock received through the exercise of an option is subject to a restriction regarding its disposition which *215 has a significant effect on its value, the compensatory element is realized at the time the restrictions lapse or at the time the underlying stock is sold in an arm's-length transaction, whichever occurs earlier. Section 1.4216(d), Income Tax Regs., provides in part: If the option does not have a readily ascertainable fair market value at the time it is granted, the employee in connection with whose employment the option is granted is considered to realize compensation includible in gross income under section 61 at the time and in the amount determined in accordance with the following rules of this paragraph: (1) Except as provided in subparagraph (2) of the paragraph, if the option is exercised by the person to whom it was granted, the employee realizes compensation at the time an unconditional right to receive the property subject to the option is acquired by such person, and the amount of such compensation is the difference between the amount payable for the property [under the option] and the fair market value of the property at the time an unconditional right to receive the property is acquired * * *. (2)(i) If the option is exercised by the person to whom it was granted *216 but, at the time an unconditional right to receive the property subject to the option is acquired by such person, such property is subject to a restriction which has a significant effect on its value, the employee realizes compensation at the time such restriction lapses or at the time the property is sold or exchanged, in an arm's-length transaction, whichever occurs earlier * * *. The Metrocare prospectus states that Mr. Nazarian exercised the option in March of 1969 and that he received 10,000 shares of Metrocare stock for the price of $ .15 per share. Petitioners have failed to provide evidence to the contrary. Indeed, the evidence demonstrates that Associated complied with its contract with Consolidated and that the sale of the Twin Palms facility was consummated on February 6, 1969. The stock to be issued under the option was to be purchased for investment purposes and not with a view towards resale. Accordingly, the agreement between Mr. Nazarian and Metrocare contained a provision that stock to be issued thereunder would not be registered under the Securities Act of 1933. The agreement further provided that, at the option of Metrocare, the stock certificates to be issued *217 could contain an inscription that they are issued without registration under the Securities Act of 1933. The agreement also recited that Mr. Nazarian would agree to enter into an additional agreement, upon the request of Metrocare, to not sell or otherwise dispose of his stock without the prior written consent of Metrocare for a period of time, not exceeding two years, following the initial offering of Metrocare stock. In Hirsch v. Commissioner,51 T.C. 121 (1968), the taxpayer received an option to purchase certain shares of his corporate employer's common stock. The option agreement between Hirsch and his employer indicated that the stock to be issued to Hirsch would not be registered under the Securities Act of 1933. Upon the exercise of the option, Hirsch attempted to register his shares with the SEC but he was not successful. We held that Hirsch's inability to register the shares with the SEC was a restriction which had "a significant effect on its value". We stated that under section 1.421-6(d)(2)(i), Income Tax Regs., the option was not taxable until this restriction lapsed. The rationale of Hirsch v. Commissioner, supra, that *218 Federal securities laws operate as a restriction which may significantly affect the value of an option, was rejected by the Seventh Circuit in Frank v. Commissioner,447 F.2d 552 (7th Cir. 1971), affg. 54 T.C. 75 (1970). The taxpayer entered an option agreement similar to the option found in Hirsch v. Commissioner, supra. The Seventh Circuit held: We believe the Tax Court's decision in Hirsch is erroneous in that we do not believe that restrictions on transferability arising by operation of securities law were intended to be included within the meaning of the applicable Treasury Regulation. Rather, the purpose of the regulation was to defer taxation on exercise of options only where the underlying stock was subject to a contractual limitation which prevented the sale of the stock at its fair market value. * * * [447 F.2d at 556.] In Bayley v. Commissioner,69 T.C. 234 (1977), affd. 624 F.2d 884 (9th Cir. 1980), we reaffirmed our position in Hirsch v. Commissioner, supra, that the inability to sell shares under the Securities Act of 1933 amounted to a restriction which *219 significantly affected the value of shares received under an option. The Metrocare prospectus states that Mr. Nazarian exercised the option in March 1969 receiving 10,000 shares of common stock for $ .15 per share. The prospectus makes no reference to the existence of restrictions on the stock received by Mr. Nazarian. Petitioners did not provide any evidence to show that Metrocare imposed any of the restrictions it was entitled to under the option agreement. The stock to be issued under the agreement was to be unregistered under the Securities Act of 1933 and it was to be held for investment. We have no evidence, however, as to when the stock was to be registered or as to what action, if any, was taken regarding registration of the stock. The stock could have been registered later in 1969. Petitioners have failed to present any evidence regarding the registration of the stock issued upon exercise of the option. Petitioners have also failed to present evidence to show the value of the Metrocare stock other than the value on the date the option was exercised. Petitioners have failed to satisfy their burden of disproving respondent's determination that Mr. Nazarian was taxable *220 on the difference between the option price and the fair market value of the stock. Accordingly, we find that respondent correctly determined the adjustments to petitioners' income. Petitioners are taxable on the difference between the fair market value of 10,000 shares of Metrocare stock as of March 1969, $ 120,000, and the option's exercise price of $ 1,500. Respondent concedes that petitioners are properly entitled to a $ 1,500 reduction in the $ 120,000 adjustment to reflect the option's exercise price. D. Unreported Income Received
During 1967, 1968, and 1969, Mr. Nazarian made payments to Associated by checks drawn on a Twin Palms account at the Golden State Bank. Mr. Nazarian also received payments from Anglo Dutch from 1968 through 1972. Petitioners failed to report any of these payments as income on their joint returns for the years in issue. Respondent determined that payments received by petitioners from Anglo Dutch in 1968, 1969, 1970, 1971, and 1972, and from Artesia in 1969 are taxable to petitioners. Petitioners bear the burden of proving these payments are not taxable income. Welch v. Helvering, supra; Rule 142(a). The burden of proof *221 in this Court requires petitioners to demonstrate the merits of their claim by a preponderance of the evidence. Rapp v. Commissioner, supra; Rockwell v. Commissioner, supra.
Petitioners claim that the payments received from Anglo Dutch represent the tax-free receipt of loan proceeds. They have presented no corroborative evidence such as promissory notes or other documents which would establish that a bona fide loan had been made to Mr. Nazarian. There is no evidence that Mr. Nazarian repaid this principal or accrued interest to Anglo Dutch. Between 1967 and 1969, Artesia reported over $ 1.5 million in gross income generated from its operation of the hospital. This gross income, however, was materially reduced by "rental" expenses allegedly incurred in leasing the hospital from Associated. Associated was merely a convenient conduit for the tax-free removal of profits from petitioners' operation of the convalescent hospital. The hospital's profits were channeled to Associated and then returned to Nazarian in the form of "loan" proceeds from a second Margolis entity. In this manner, petitioners were insulated from taxation on their hospital's profits. Petitioners *222 have failed to meet their burden of proof, and we therefore sustain respondent's determination that payments from Anglo Dutch to Mr. Nazarian represent taxable income to petitioners. Respondent concedes that the payments by checks drawn by Mr. Nazarian to Associated on the Twin Palms' account are not taxable income to petitioners to the extent we find that the payments from Anglo Dutch to petitioner do represent taxable income. Petitioners also failed to report income from payments Mr. Nazarian made to himself in 1969 from a Twin Palms account with the Golden State Bank. Respondent determined that these payments constitute taxable income of $ 100,618.50. Petitioners again failed to present any evidence contradicting respondent's determination. Mr. Nazarian's self-serving testimony cannot satisfy petitioners' burden of proof. Potts, Davis and Company v. Commissioner,431 F.2d 1222 (9th Cir. 1970); Wood v. Commissioner,338 F.2d 602 (9th Cir. 1964). We find that petitioners must recognize these payments as taxable income. E. Interest Expense Deductions
Petitioners assert that they are entitled to deduct the interest paid on loans. Respondent *223 disallowed these deductions on the grounds that the transactions involved did not give rise to genuine indebtedness. Interest paid or accrued within the taxable year on indebtedness may be deducted. Section 163(a). "Interest" means compensation for the use of borrowed money. Old Colony R. Co. v. Commissioner,284 U.S. 552 (1932). "Indebtedness" has been defined as the unconditional and legally enforceable obligation for the payment of money. Autenreith v. Commissioner,115 F.2d 856 (3d Cir. 1940), affg. 41 B.T.A. 319 (1940); Kovtun v. Commissioner,54 T.C. 331, 338 (1970), affd. 448 F.2d 1268 (9th Cir. 1971). A person has a right to arrange his affairs in a manner that reduces his income tax liability, but it is equally well established that the substance of a transaction must control over form. Gregory v. Helvering, supra. Transfers whereby nothing of economic substance is achieved beyond the realization of tax deductions are shams and will not be given effect for tax purposes. Knetsch v. United States, supra; Goodstein v. Commissioner,30 T.C. 1178 (1958), affd. *224 267 F.2d 127 (1st Cir. 1959). Petitioners have the burden of proving that the interest they claim to have paid on loans was actually interest on genuine indebtedness, rather than a transaction manufactured solely to create a deduction. Welch v. Helvering, supra; Rule 142(a). Petitioners introduced documents attesting to the form of transactions which give rise to interest deductions. Bookkeeping entries alone do not provide sufficient evidence, in and of themselves, of the payment of a deductible expense. Goldwyn v. Commissioner,9 T.C. 510 (1947), affd. 175 F.2d 641 (9th Cir. 1949). Gloria Felcyn, a certified public accountant formerly employed by the Margolis law office, was offered as an expert witness. She testified that the Margolis law office adhered to generally accepted accounting principles. Ms. Felcyn also offered her opinion that the business records reflect that petitioners actually made the interest payments at issue. Ms. Felcyn, however, was not employed by the Margolis law office during the years here in issue. She did not personally make the bookkeeping entries which allegedly reflect petitioners' *225 payment of interest, and could not accurately identify such entries. Accordingly, Ms. Felcyn's testimony regarding the nature of the payments here in issue or whether they were in fact made has no value. These loans lack economic substance beyond achieving desired tax effects. They are circular transactions of funds in which no money was lent in a substantive sense. Mr. Nazarian forwarded profits from the hospital to Associated in the form of rental payments, which were then returned to Mr. Nazarian through Anglo Dutch and Antigua Banking as "loan proceeds." No true indebtedness was incurred, and no true interest was paid. Respondent correctly disallowed petitioners' interest deductions. F. Interest Income from Certificates of Deposit
Respondent determined that petitioners received and failed to report $ 27,666.20 of taxable income in 1969 from interest on certificates of deposit. The certificates of deposit were drawn on the Golden State Bank and issued to World Minerals, N.V. on February 12, 1969, and bore the notation that interest earned was payable to Mr. Nazarian. Mr. Nazarian testified that he received interest payments from the Golden State Bank in the amount *226 of $ 27,666.20 in 1969, but insisted that he received the interest for the benefit of the holder of the "notes." Petitioners reported only $ 70.00 of interest income from Golden State Bank on their 1969 joint return. Interest income is taxable under section 61(a)(4). The burden of proof is on petitioners to demonstrate that the interest payments Mr. Nazarian received did not represent taxable income. See Welch v. Helvering, supra; Rule 142(a). Mr. Nazarian's testimony was the only evidence offered by petitioners to support their claim that they received interest payments on behalf of World Minerals. The record contains no evidence of an agreement between World Minerals and petitioners, whereby Mr. Nazarian was to receive interest payments on its behalf. Mr. Nazarian's self-serving testimony cannot satisfy petitioners' burden of proof. Potts, Davis and Company v. Commissioner, supra;Wood v. Commissioner, supra.Petitioners have failed to satisfy their burden of proof and we find that respondent correctly determined that petitioners must recognize interest income from these certificates. G. Petitioners' Basis in Real Estate
*227 Petitioners reported the sale of a "mountain home" on their 1970 joint return. They reported a basis in the property equal to their gross sales price realized of $ 35,000, and thus reported no taxable gain. Respondent determined that petitioners had failed to establish their basis in the property and increased petitioners' taxable income by $ 35,000. A taxpayer's basis in an asset is generally cost. Sections 1011 and 1012. This basis figure may be adjusted, however, by such factors as depreciation, cost of improvements, and other items properly chargeable to the capital account. Section 1016; section 1.1016-3, Income Tax Regs. Where respondent has determined in a statutory notice of deficiency that a taxpayer's basis in property is zero, the taxpayer bears the burden of proving basis for the purpose of calculating gain or loss on the sale of the underlying property. Welch v. Helvering, supra;Counts v. Commissioner,42 T.C. 755, 760 (1964); Rule 142(a). Mr. Nazarian testified that he had purchased a "mountain home" for $ 35,000 in 1970 and then sold it in the same year for the same amount. Petitioners failed to introduce any documents or other *228 evidence to corroborate Mr. Nazarian's unsupported testimony as to his purchase of this property, or why he sold it so soon after its purchase. Petitioners have failed to satisfy their burden of proving their proper basis in this property. We sustain respondent's determination that petitioners must recognize additional taxable income of $ 35,000 for 1970. H. Long-Term and Short-Term Loss Carryover
In 1970 and 1971 petitioners claimed long-term and short-term capital loss carryover deductions from losses they allegedly sustained in 1965 on the sale of Twin Palms stock to Aruba Bonaire, and in 1968 on the sale of Vista Industry stock. Respondent disallowed these deductions in the statutory notices for 1970 and 1971. A deduction for capital losses is permitted by section 1211. To the extent that the capital loss is incurred by an individual, and not utilized in the year the loss arose, it may be carried forward and claimed as a loss in succeeding years. Section 1212; Section 1.1212-1(b), Income Tax Regs. Petitioners bear the burden of establishing that a deductible loss arose and that the loss was subject to carryover. Welch v. Helvering, supra;Benson v. Commissioner,80 T.C. 789, 804 (1983); *229 Rule 142(a). The capital loss carryover deductions claimed by petitioners have their genesis in capital losses reported in 1965 and 1968. As indicated above, this Court has found that Mr. Nazarian never sold his Twin Palms stock to Aruba Bonaire in 1965. The alleged sale was a sham transaction designed to insulate Mr. Nazarian from taxable gain upon the subsequent bona fide sale of the hospital facilities. Petitioners have not demonstrated that a deductible loss arose in 1965 and have also failed to offer any evidence regarding their alleged sale of "Vista Industry" stock in 1968, other than Mr. Nazarian's unsubstantiated testimony. These unsubstantiated capital losses may not be carried over to subsequent tax years and respondent correctly disallowed these deductions. I. 1970 Bad Debt Expense
In 1970 petitioners deducted $ 8,792.00 as a bad debt. Respondent disallowed this deduction on the grounds that petitioners had not established that they had sustained a loss from a deductible bad debt. "[A]ny debt which becomes worthless within the taxable year" may be deducted. Section 166. If the bad debt was incurred in the taxpayer's trade or business, the worthlessness *230 of the debt is treated as an ordinary loss. Section 166(a). Where a non-business bad debt is involved, the loss is treated as a short-term capital loss. Section 166(d). The determination of whether a bad debt is related to a taxpayer's trade or business depends on whether the taxpayer's "dominant motivation" in advancing the funds was to benefit his trade or business. United States v. Generes,405 U.S. 93 (1971); Scifo v. Commissioner,68 T.C. 714 (1977)
Where a taxpayer makes a payment as the cosignor of a note because the primary obligor has failed or is unable to make payment, such a payment may constitute a loss subject to section 166. Putman v. Commissioner,352 U.S. 82 (1956); Martin v. Commissioner,52 T.C. 140 (1969), affd. 424 F.2d 1368 (9th Cir. 1970). First, however, petitioners must establish that the debt existed and in fact became worthless. To establish the worthlessness of a debt, petitioners have the burden to demonstrate that they made a reasonable effort to collect. Welch v. Helvering, supra;section 1.166-3(a)(2)(iii), Income Tax Regs. The subjective good *231 faith opinion of a taxpayer as to his collection efforts will not satisfy the burden of proof. Fox v. Commissioner,50 T.C. 813 (1968), affd. in an unreported opinion (9th Cir. 1970, 70-1 USTC par. 9373, 25 AFTR2d 70-891). Mr. Nazarian's collection efforts were limited to a search of a safety deposit box. Petitioners failed to present evidence to show that the gasoline station owner did not possess assets at the time of his death which could have been used to satisfy the note without resort to Mr. Nazarian's personal funds. Also, petitioners failed to present any evidence of the cosigned promissory note itself, or of the alleged payment from Mr. Nazarian's personal funds. Mr. Nazarian's limited testimony was the only evidence offered by petitioners in support of this deduction. Mr. Nazarian's self-serving testimony does not satisfy petitioners' burden of proof. Potts, Davis and Company v. Commissioner, supra;Wood v. Commissioner, supra.Petitioners failed to establish that a deductible bad debt loss was incurred, and respondent correctly disallowed this deduction. J. Additions to Tax
Finally, respondent determined *232 that petitioners were liable for additions to tax under section 6653(a) for 1967 through 1974 because the underpayments in those years were attributable to petitioners' negligence. A five percent addition to tax is imposed when any part of an underpayment is due to a taxpayer's "negligence or intentional disregard of rules or regulations." Section 6653(a). Respondent's determination is prima facia correct and the burden of disproving the applicability of the addition to tax is upon the taxpayer. Rule 142(a); Hall v. Commissioner,729 F.2d 632, 635 (9th Cir. 1984); Hanson v. Commissioner,696 F.2d 1232, 1234 (9th Cir. 1983). Negligence is determined by the reasonable, prudent person standard. Zmuda v. Commissioner,731 F.2d 1417 (9th Cir. 1984). Petitioners have attempted to shield themselves from liability for negligence by claiming reliance upon their accountant, David Menkes. Mr. Nazarian testified that Mr. Menkes prepared petitioners' joint tax returns for the years in issue and that petitioners relied in good faith on Mr. Menkes professional expertise. This testimony, however, was directly contradicted by Mr. Menkes who *233 testified that he prepared petitioners' tax returns based solely upon information provided to him by Mr. Nazarian which he did not independently confirm. The Ninth Circuit, to which these cases are appealable, has held that a taxpayer's good faith reliance on the substantive advice of an attorney or accountant will avoid the addition to tax for negligence. Betson v. Commissioner,802 F.2d 365, 372 (9th Cir. 1986). We have held similarly. See, e.g., Industrial Valley Bank & Trust Co. v. Commissioner,66 T.C. 272, 283 (1976) ("Reasonable reliance on the advice of an expert suffices to avoid the negligence penalty"). The key to absolution, however, is that the reliance on the tax advisor be reasonable and in good faith. On the record before us, we cannot conclude that petitioners' reliance on any professional advice they may have obtained in preparing the returns in question was either reasonable or in good faith. Contrary to Mr. Nazarian's testimony, petitioners were sophisticated investors who know, or should have known, that they were participating in an egregious tax avoidance scheme and that the transactions they engaged in did not give *234 rise to legitimate tax consequences. Petitioners are liable for the additions to tax as determined by respondent. Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. The remaining 20-percent stock interest in Artesia was held by Flora Logan.↩
3. We recognize that petitioners used the entire $ 3,606 short-term capital loss prior to 1971. In any event, they claimed the $ 267 amount in that year.↩
4. The taxation of stock options is determined under section 83. Section 83 is expressly inapplicable, however, to property transferred pursuant to a binding written contract entered into before April 22, 1969 or where the property was transferred upon the exercise of an option granted before April 22, 1969.↩